THE PEOPLE OF THE STATE OF NEW YORK, Respondent,
v. JOSEPH ZACKOWITZ, Appellant.

(Argued June 9, 1930; decided July 8, 1930.)

*John J. Riordan* and *E. Ivan Rubenstein* for appellant. The People failed to establish the defendant's guilt of murder in the first degree beyond a reasonable doubt. (*People* v. *Guadagnino*, 233 N. Y. 344.) Proof of the

possession of guns not involved in homicide by the defendant was improperly permitted and said guns were improperly received in evidence as exhibits. (*People* v. *Molineux*, 168 N. Y. 264; *People* v. *Hinksman*, 192 N. Y. 421; *Potter* v. *Browne*, 197 N. Y. 288; *People* v. *De Garmo*, 179 N. Y. 130; *People* v. *Dietz*, 216 App. Div. 23; *People* v. *Figara*, 218 App. Div. 638; *People* v. *Pettanza*, 207 N. Y. 560.)

*George E. Brower, District Attorney (Henry J. Walsh* of counsel), for respondent. The appellant was guilty of the crime of murder in the first degree. (*People* v. *Place*, 157 N. Y. 584; *People* v. *O' Neill*, 112 N. Y. 355; *People* v. *Conroy*, 97 N. Y. 62; *People* v. *Kerrigan*, 147 N. Y. 210; *People* v. *Ferraro*, 161 N. Y. 365; *People* v. *Sanducci*, 195 N. Y. 361; *People* v. *Poulin*, 207 N. Y. 73; *People* v. *Majone*, 91 N. Y. 211; *People* v. *Breen*, 181 N. Y. 493; *People* v. *Chiaro*, 200 N. Y. 316; *Thomas* v. *People*, 67 N. Y. 218; *People* v. *Governale*, 193 N. Y. 581; *People* v. *Jackson*, 196 N. Y. 357; *People* v. *Barberi*, 149 N. Y. 256; *People* v. *Guadagnino*, 233 N. Y. 344; *People* v. *Schmidt*, 168 N. Y. 568; *People* v. *Gilbert*, 199 N. Y. 10.) Proof that several revolvers other than the weapon with which the homicide was committed were found in the appellant's home after his arrest and that the appellant admitted ownership of them was properly received. (*People* v. *Hill*, 198 N. Y. 64; *People* v. *Rodawald*, 177 N. Y. 408; *People* v. *Del Vermo*, 192 N. Y. 470; *People* v. *Kinney*, 202 N. Y. 389; 1 Wigmore on Evidence, 218; *People* v. *De Garmo*, 179 N. Y. 130.)

CARDOZO, Ch. J. On November 10, 1929, shortly after midnight, the defendant in Kings county shot Frank Coppola and killed him without justification or excuse. A crime is admitted. What is doubtful is the degree only.

Four young men, of whom Coppola was one, were at work repairing an automobile in a Brooklyn street. A woman, the defendant's wife, walked by on the opposite

side. One of the men spoke to her insultingly, or so at least she understood him. The defendant, who had dropped behind to buy a newspaper, came up to find his wife in tears. He was told she had been insulted, though she did not then repeat the words. Enraged, he stepped across the street and upbraided the offenders with words of coarse profanity. He informed them, so the survivors testify, that "if they did not get out of there in five minutes, he would come back and bump them all off." Rejoining his wife, he walked with her to their apartment house located close at hand. He was heated with liquor which he had been drinking at a dance. Within the apartment he induced her to tell him what the insulting words had been. A youth had asked her to lie with him, and had offered her two dollars. With rage aroused again, the defendant went back to the scene of the insult and found the four young men still working at the car. In a statement to the police, he said that he had armed himself at the apartment with a twenty-five calibre automatic pistol. In his testimony at the trial he said that this pistol had been in his pocket all the evening. Words and blows followed, and then a shot. The defendant kicked Coppola in the stomach. There is evidence that Coppola went for him with a wrench. The pistol came from the pocket, and from the pistol a single shot, which did its deadly work. The defendant walked away and at the corner met his wife who had followed him from the home. The two took a taxicab to Manhattan where they spent the rest of the night at the dwelling of a friend. On the way the defendant threw his pistol into the river. He was arrested on January 7, 1930, about two months following the crime.

At the trial the vital question was the defendant's state of mind at the moment of the homicide. Did he shoot with a deliberate and premeditated design to kill? Was he so inflamed by drink or by anger or by both

combined that, though he knew the nature of his act, he was the prey to sudden impulse, the fury of the fleeting moment? (*People* v. *Caruso*, 246 N. Y. 437, 446). If he went forth from his apartment with a preconceived design to kill, how is it that he failed to shoot at once? How reconcile such a design with the drawing of the pistol later in the heat and rage of an affray? These and like questions the jurors were to ask themselves and answer before measuring the defendant's guilt. Answers consistent with guilt in its highest grade can reasonably be made. Even so, the line between impulse and deliberation is too narrow and elusive to make the answers wholly clear. The sphygmograph records with graphic certainty the fluctuations of the pulse. There is no instrument yet invented that records with equal certainty the fluctuations of the mind. At least, if such an instrument exists, it was not working at midnight in the Brooklyn street when Coppola and the defendant came together in a chance affray. With only the rough and ready tests supplied by their experience of life, the jurors were to look into the workings of another's mind, and discover its capacities and disabilities, its urges and inhibitions, in moments of intense excitement. Delicate enough and subtle is the inquiry, even in the most favorable conditions, with every warping influence excluded. There must be no blurring of the issues by evidence illegally admitted and carrying with it in its admission an appeal to prejudice and passion.

Evidence charged with that appeal was, we think, admitted here. Not only was it admitted, and this under objection and exception, but the changes were rung upon it by prosecutor and judge. Almost at the opening of the trial the People began the endeavor to load the defendant down with the burden of an evil character. He was to be put before the jury as a man of murderous disposition. To that end they were allowed to prove that at the time of the encounter and at that

of his arrest he had in his apartment, kept there in a radio box, three pistols and a tear-gas gun. There was no claim that he had brought these weapons out at the time of the affray, no claim that with any of them he had discharged the fatal shot. He could not have done so, for they were all of different calibre. The end to be served by laying the weapons before the jury was something very different. The end was to bring persuasion that here was a man of vicious and dangerous propensities, who because of those propensities was more likely to kill with deliberate and premeditated design than a man of irreproachable life and amiable manners. Indeed, this is the very ground on which the introduction of the evidence is now explained and defended. The District Attorney tells us in his brief that the possession of the weapons characterized the defendant as " a desperate type of criminal," a " person criminally inclined." The dissenting opinion, if it puts the argument less bluntly, leaves the substance of the thought unchanged. " Defendant was presented to the jury as a man having dangerous weapons in his possession, making a selection therefrom and going forth to put into execution his threats to kill." The weapons were not brought by the defendant to the scene of the encounter. They were left in his apartment where they were incapable of harm. In such circumstances, ownership of the weapons, if it has any relevance at all, has relevance only as indicating a general disposition to make use of them thereafter, and a general disposition to make use of them thereafter is without relevance except as indicating a " desperate type of criminal," a criminal affected with a murderous propensity.

We are asked to extenuate the error by calling it an incident: what was proved may have an air of innocence if it is styled the history of the crime. The virus of the ruling is not so easily extracted. Here was no passing reference to something casually brought out in the narrative of the killing, as if an admission had been proved

against the defendant that he had picked one weapon out of several. Here in the forefront of the trial, immediately following the statement of the medical examiner, testimony was admitted that weapons, not the instruments of the killing, had been discovered by the police in the apartment of the killer; and the weapons with great display were laid before the jury, marked as exhibits, and thereafter made the subject of animated argument. Room for doubt there is none that in the thought of the jury, as in that of the District Attorney, the tendency of the whole performance was to characterize the defendant as a man murderously inclined. The purpose was not disguised. From the opening to the verdict, it was flaunted and avowed.

If a murderous propensity may be proved against a defendant as one of the tokens of his guilt, a rule of criminal evidence, long believed to be of fundamental importance for the protection of the innocent, must be first declared away. Fundamental hitherto has been the rule that character is never an issue in a criminal prosecution unless the defendant chooses to make it one (Wigmore, Evidence, vol. 1, §§ 55, 192). In a very real sense a defendant starts his life afresh when he stands before a jury, a prisoner at the bar. There has been a homicide in a public place. The killer admits the killing, but urges self-defense and sudden impulse. Inflexibly the law has set its face against the endeavor to fasten guilt upon him by proof of character or experience predisposing to an act of crime (Wigmore, Evidence, vol. 1, §§ 57, 192; *People* v. *Molineux*, 168 N. Y. 264). The endeavor has been often made, but always it has failed. At times, when the issue has been self-defense, testimony has been admitted as to the murderous propensity of the deceased, the victim of the homicide (*People* v. *Druse*, 103 N. Y. 655; *People* v. *Rodawald*, 177 N. Y. 408; Wigmore, Evidence, vol. 1, §§ 63, 246), but never of such a propensity on the part of the killer. The principle back of the

exclusion is one, not of logic, but of policy (Wigmore, vol. 1, §§ 57, 194; *People* v. *Richardson*, 222 N. Y. 103, 109, 110). There may be cogency in the argument that a quarrelsome defendant is more likely to start a quarrel than one of milder type, a man of dangerous mode of life more likely than a shy recluse. The law is not blind to this, but equally it is not blind to the peril to the innocent if character is accepted as probative of crime. " The natural and inevitable tendency of the tribunal — whether judge or jury — is to give excessive weight to the vicious record of crime thus exhibited, and either to allow it to bear too strongly on the present charge, or to take the proof of it as justifying a condemnation irrespective of guilt of the present charge " (Wigmore, Evidence, vol. 1, § 194, and cases cited).

A different question would be here if the pistols had been bought in expectation of this particular encounter. They would then have been admissible as evidence of preparation and design (Wigmore, Evidence, vol. 1, § 238; *People* v. *Scott*, 153 N. Y. 40). A different question would be here if they were so connected with the crime as to identify the perpetrator, if he had dropped them, for example, at the scene of the affray (*People* v. *Hill*, 198 N. Y. 64). They would then have been admissible as tending to implicate the possessor (if identity was disputed), no matter what the opprobrium attached to his possession. Different, also, would be the question if the defendant had been shown to have gone forth from the apartment with all the weapons on his person. To be armed from head to foot at the very moment of an encounter may be a circumstance worthy to be considered, like acts of preparation generally, as a proof of preconceived design. There can be no such implication from the ownership of weapons which one leaves behind at home.

The endeavor was to generate an atmosphere of professional criminality. It was an endeavor the more unfair

in that, apart from the suspicion attaching to the possession of these weapons, there is nothing to mark the defendant as a man of evil life. He was not in crime as a business. He did not shoot as a bandit shoots in the hope of wrongful gain. He was engaged in a decent calling, an optician regularly employed, without criminal record, or criminal associates. If his own testimony be true, he had gathered these weapons together as curios, a collection that interested and amused him. Perhaps his explanation of their ownership is false. There is nothing stronger than mere suspicion to guide us to an answer. Whether the explanation be false or true, he should not have been driven by the People to the necessity of offering it. Brought to answer a specific charge, and to defend himself against it, he was placed in a position where he had to defend himself against another, more general and sweeping. He was made to answei to the charge, pervasive and poisonous even if insidious and covert, that he was a man of murderous heart, of criminal disposition.

The argument is made that the evidence, if incompetent when admitted, became competent thereafter when the defendant took the stand. By taking the stand he subjected himself like any other witness to cross-examination designed to shake belief in his veracity by exhibiting his ways of life (*People* v. *Webster*, 139 N. Y. 73, 84; *People* v. *Hinksman*, 192 N. Y. 421, 433). Cross-examination brought out the fact that he had no license for a pistol. That fact disclosed, the prosecution was at liberty to prove the possession of the weapons in an attempt to impeach his credibility, since possession was a felony. All this may be true, but the evidence was not offered or admitted with such an end in view. It was received at a time when there was nothing to show that the defendant was without a license, and without suggestion that any such evidence would be brought into the case thereafter. The jury were not told that the possession of the weapons had

significance only in so far as possession without a license had a tendency to cast a shadow on the defendant's character and so to impair the faith to be given to his word (cf. Wigmore, Evidence, vol. 2, § 981, *et seq.; People* v. *De Garmo*, 179 N. Y. 130, 134, 135). They were told in effect through the whole course and tenor of the trial that irrespective of any license, the mere possession of the weapons was evidence of a murderous disposition, which, apart from any bearing upon the defendant's credibility as a witness, was evidence of guilt. Here is no case of a mere technical departure from the approved order of proof. If the evidence had been received for the purpose of impeachment merely, the People would have been bound by the answer of the witness as to the time and purpose of the purchase, and would not have been permitted to contradict him (*Stokes* v. *People*, 53 N. Y. 164, 176; *People* v. *De Garmo, supra*). Here is a case where evidence offered and received as probative of an essential element of the crime, used for that purpose, and for no other, repeatedly throughout the trial, is now about to be viewed as if accepted at a later stage and accepted for a purpose unmentioned and unthought of. This is not justice in accordance with the forms of law. " The practice of calling out evidence for one purpose, apparently innocent, and using it for another, which is illegal, is improper; and, if it is clear and manifest that the avowed object is colorable merely, its admission is error " (*Coleman* v. *People*, 55 N. Y. 81, 88). Even more plainly is it a perversion to call out evidence for an avowed object manifestly illegal, and use it later on appeal as if admitted at another stage in aid of another purpose innocent and lawful.

The judgment of conviction should be reversed, and a new trial ordered.

Pound, J. (dissenting). The indictment herein accuses defendant of the crime of murder in the first degree

committed in Kings county on November 10, 1929, by shooting Frank Coppola with a revolver. That defendant did shoot and kill Coppola is admitted. The jury was justified on the evidence in finding that he did so from a deliberate and premeditated design to effect death. The proofs tend to establish that defendant, aged twenty-four, and his seventeen-year-old wife " Fluff " had attended a dance at a dance hall; that they left for their home at 105 Devoe street about midnight; that defendant dropped behind his wife to buy some newspapers; that she went on a block ahead of him when she arrived at Devoe street; that on the opposite side of the street in the middle of the block four young men, including Coppola, were at work repairing an automobile; that Mrs. Zackowitz was either " insulted " by some remarks of one of them or thought she was; that she upbraided them; that when defendant came up to his wife she told him that she had been " insulted " and they crossed the street and defendant with much profanity threatened them that " if they did not get out of there in five minutes he would come back and bump them all off; " that defendant returned to the scene armed with a twenty-five calibre automatic pistol; that he kicked Coppola who bent over; that as Coppola got up defendant drew his pistol and fired one shot; that Coppola was struck in the lung and heart and, as a result of the shot, died soon afterwards; that defendant then met his wife on the street and they took a taxi to Manhattan; that defendant was arrested on or about January 7, 1930; that he made a confession in which he sought to defend the act of killing by saying that Coppola threatened him with a monkey wrench and that he did not realize that he had shot him; that he got the gun at his home and went back to ask them to apologize; that he took the gun to protect himself " because they were four guys; " that he had been drinking, was a little excited but not drunk; that he knew what he was doing.

On the trial, defendant and his wife testified. Defend-

ant said in substance that he had carried the .25 automatic to the dance and had it with him on the occasion of the first encounter; that he talked with the men; that they denied that they had insulted his wife; that he thought it was not worth quarreling about and left them; that he did not threaten to bump them off; that when they went home his wife in tears and evident distress reluctantly told him that they had made a proposition to her which was understood as an offer of two dollars for sexual intercourse; that he went back to demand an apology; that he kicked at Coppola but did not hit him; that Coppola threatened him with a monkey wrench; that he was frightened; that he did not intend to kill Coppola but drew the pistol to frighten him; that the discharge of the gun was an accident; that he was partly intoxicated; that he had no permit to carry a gun.

The court submitted to the jury the various degrees of felonious homicide, and the law as to justifiable and excusable homicide and instructed them particularly as to the law of killing in self-defense. On the theory that defendant repudiated intoxication as a partial defense, tending to reduce the degree of the crime, the court did not instruct the jury on the question of intoxication. (Penal Law, § 1220.) In the circumstances, the judgment should not be reversed on this ground as the defendant did not make the question a serious one. (*People* v. *Van Zandt*, 224 N. Y. 354; *People* v. *Koerber*, 244 N. Y. 147, 150.) At the conclusion of the charge defendant's counsel said:

" Mr. Rubenstein: The defendant excepts to the entire charge, and specifies as his ground the manner in which the charge was delivered, the inflection of your Honor's voice, the use of your hands, your eyebrows — the pauses and other mannerisms. No requests."

Unfortunately, perhaps, we have no record of the judge's manner of delivery. The point is not pressed on the appeal.

The questions of intent and deliberation and premeditation were for the jury. Their verdict is amply sustained by the evidence and the conviction should be affirmed " without regard to technical errors or defects which have not prejudiced the substantial rights of the defendants." (Code Crim. Pro. § 764.) " But the question of substantial right is not the abstract question of guilt or innocence. A guilty man is entitled to a fair trial. * * * Error is substantial when we can say that it tended to influence the verdict." (*People* v. *Sobieskoda*, 235 N. Y. 411.) We must, therefore, give careful heed to one matter which is brought to our attention on this appeal without regard to the convincing character of the People's evidence.

Nearly two months after the killing of Coppola, the police entered defendant's home in connection with his arrest and found there concealed in a box in the radio three revolvers and a tear-gas bomb, together with a supply of cartridges suitable for use both in the revolvers and the bomb. Defendant had in his confession, which was received without objection, admitted that he had these weapons in his possession at the time of the killing. The twenty-five calibre automatic was not among them. Defendant says that he threw it away after he shot Coppola. The People, as a part of their principal case, introduced these articles in evidence over defendant's objection and exception. This is the only ruling by which the question of error in law is presented on this appeal. No objection was made to the summation by the District Attorney nor to any specific instructions by the court. The possession of these dangerous weapons was a separate crime. (Penal Law, § 1897.) The broad question is whether it had any connection with the crime charged. The substantial rights of the defendant must be protected. Where the penalty is death, we may grant a new trial if justice requires it, even though no exception was taken in the court below. (Code Crim. Pro. § 528.)

The People may not prove against a defendant crimes not alleged in the indictment committed on other occasions than the crime charged as aiding the proofs that he is guilty of the crime charged unless such proof tends to establish (1) motive; (2) intent; (3) absence of mistake or accident; (4) a common scheme or plan embracing the commission of two or more crimes so related to each other that proof of the one tends to establish the other; (5) the identity of the person charged with the commission of the crime on trial. These exceptions are stated generally and not with categorical precision and may not be all-inclusive. (*People* v. *Molineux*, 168 N. Y. 264; *People* v. *Pettanza*, 207 N. Y. 560; *People* v. *Moran*, 246 N. Y. 100, 106.) None of them apply here nor were the weapons offered under an exception to the general rule. They were offered as a part of the transaction itself. The accused was tried only for the crime charged. The real question is whether the matter relied on has such a connection with the crime charged as to be admissible on any ground. If so, the fact that it constitutes another distinct crime does not render it inadmissible. (*Commonwealth* v. *Snell*, 189 Mass. 12, 21.) The rule laid down in the *Molineux* case has never been applied to prevent the People from proving all the elements of the offense charged, although separate crimes are included in such proof. Thus in this case no question is made as to the separate crime of illegal possession of the weapon with which the killing was done. It was " a part of the history of the case " having a distinct relation to and bearing upon the facts connected with the killing. (*People* v. *Governale*, 193 N. Y. 581; *People* v. *Rogers*, 192 N. Y. 331; *People* v. *Hill*, 198 N. Y. 64; *People* v. *Rodawald*, 177 N. Y. 408.)

As the District Attorney argues in his brief, if defendant had been arrested at the time of the killing and these weapons had been found on his person, the People would not have been barred from proving the fact, and the further fact that they were nearby in his apartment

should not preclude the proof as bearing on the entire deed of which the act charged forms a part. Defendant was presented to the jury as a man having dangerous weapons in his possession, making a selection therefrom and going forth to put into execution his threats to kill; not as a man of a dangerous disposition in general, but as one who, having an opportunity to select a weapon to carry out his threats, proceeded to do so.

If the confession was admissible on this point, the weapons themselves were admissible in evidence. If the evidence corroborates the confession and several crimes having " an obvious relation to the crime charged in the indictment " are referred to in the same confession, both the entire confession and the corroborative evidence are admissible. (*People* v. *Rogers, supra,* p. 352.) The relation between the possession of the weapons and the crime charged tended to corroborate the confession as a whole. The sequence of events made the chain incomplete without this important link.

The case would have been quite different if the weapons came into defendant's possession after the killing. The proof would then be of separate crimes unconnected with the killing and its admission reversible error under the *Molineux Case (supra)*.

It is urged that defendant may have been half-drunk, infuriated, frightened, impulsive and measurably irresponsible; that he should not have been convicted of murder in the first degree; that the proof of possession of the weapons prejudiced the jury against him. If, as we have held, the proof was competent, the jury was free to give it such weight as it deserved. On the other hand, if it was incompetent, was the error substantial enough to call for the reversal of his conviction? Defendant presented his side of the case to the jury. He gave his account of the weapons and how he came by them, which was consistent with innocent purpose on his part. Admittedly he did have an argument with Coppola and his fellows, did go

home, did return armed and did quarrel and kill. His answer is that the killing was accidental. How can we say with confidence in the circumstances of this case that the evidence, even if technically objectionable, so tended to influence the jury against him that " justice requires a new trial? " (Code Crim. Pro. § 528.) . While it is not inconceivable that the result might have been otherwise without this evidence (*People* v. *Slover*, 232 N. Y. 264, 267), it is unlikely that it turned the minds of the jury from a lesser degree of crime to the disadvantage of accused. In the circumstances of this case, whether he had one weapon or a dozen would not materially change the nature of his offense. The proof merely darkened that which was black enough when painted by his own brush.

The judgment of conviction should be affirmed.

LEHMAN, KELLOGG and O'BRIEN, JJ., concur with CARDOZO, Ch. J.; POUND, J., dissents in opinion in which CRANE and HUBBS, JJ., concur.

Judgment reversed, etc.