[Crim. No. 9398. Fourth Dist., Div. Two. Apr. 12, 1978.]

THE PEOPLE, Plaintiff and Respondent, v.
WARREN LEE HASLOUER, Defendant and Appellant.

## COUNSEL

Paul Halvonik, State Public Defender, under appointment by the Court of Appeal, and Charles M. Sevilla, Chief Assistant State Public Defender, for Defendant and Appellant.

Evelle J. Younger, Attorney General, Jack R. Winkler, Chief Assistant Attorney General, Daniel J. Kremer, Assistant Attorney General, Harley D. Mayfield and John W. Carney, Deputy Attorneys General, for Plaintiff and Respondent.

## OPINION

GARDNER, P. J.—Defendant was convicted of four counts of sexually molesting Jana and Gina. He was acquitted of five similar counts against other children.

In count I, he was convicted of violation of Penal Code section 288 against Jana on or about July 2, 1976. In count II, he was convicted of violation of Penal Code section 288a against Jana on or about July 2, 1976. In count III, he was convicted of contributing to the delinquency of Gina on or about July 2, 1976. In count IV, he was convicted of violation of Penal Code section 288 against Jana on or about June 18, 1976. In counts V to IX, he was acquitted of similar offenses against Rebecca, Susan and his daughter, Lee Ann.

Since counts I, II and III all relate to the date of July 2, 1976, they may be discussed together.

Gina was a seventh grader. A few days prior to July 4, 1976, she received a call from her nine-year old sister, Jana, and defendant's daughter, Lee Ann. They asked Gina to come to defendant's house to look at some pictures. When she arrived, Gina was told that she would have to wear a T-shirt or she could not see the pictures. Defendant gave

the girls T-shirts. They removed their clothing and put on the T-shirts. Gina was told not to wear anything under the shirt. The defendant removed his clothing and changed into a bathrobe in the presence of the children. He obtained a bottle marked "Making Love Body Lotion" and rubbed some of the contents on his penis. All the girls and defendant then sat in a circle and looked at some playing cards which had pictures of men and women engaged in various sexual activities. Jana then said it was time to show Gina "what we do." Jana then laid on the floor and the defendant got on top of her where he remained until Jana told him to stop it. Defendant then returned to his sitting position and Jana placed her mouth over his penis. Defendant attempted to have Gina touch his penis, but she slapped his hand.

As to count IV, in June of 1976, Lee Ann, Jana and defendant were in the defendant's bathroom. Again, he was in his robe and the girls were only wearing their tops. Defendant took out the cards with the sexually explicit pictures. He told them to pick out a card and the girls picked one and performed the same act as that depicted on the card.

Rather obviously, substantial evidence supports each conviction and the defendant makes no contention to the contrary.

The testimony of Valerie was admitted as a prior similar act. It was not charged in the information.

Valerie was eight years old. She stayed overnight at defendant's home with her friend, Lee Ann. Defendant entered the bedroom, again in his bathrobe, and told the girls to put on their T-shirts. They both put on T-shirts obtained from defendant's dresser. Lee Ann removed her panties and told Valerie to do so also. Valerie did. They all went into Lee Ann's bedroom. Defendant told Lee Ann to lie down and told her to lay on him. Valerie refused to become involved. Lee Ann did as she was told. The defendant's robe was open when Lee Ann lay on him and he had nothing under the robe. They all then went into the defendant's bedroom where the girls sat on the floor and were shown the same sexually explicit playing cards which the defendant had taken from his closet. Defendant asked Valerie "which one do you want to do?" and Valerie said, "none of them." The defendant then asked Lee Ann to pick a card and she did and she and the defendant then performed the act depicted thereon.

A search of defendant's home via a search warrant revealed a bottle labeled "Making Love Body Lotion" and the sexually explicit playing cards.

Lee Ann had a conversation with the police officer. In reference to a question as to whether she and her girl friend ever played a game in which they put their mouths on her father's penis, she said, "I never did it; Jana did it." She denied that her father put his penis inside Jana but she said he was just lying on top of her. She said they had played this game a few times, that her father told her not to tell anyone and that her father kept asking her to bring other children over to play.

On appeal, defendant contends:

(1) That the admission of Valerie's testimony as a similar act was error. Not so.

For reasons we hereafter explain, we conclude that under certain circumstances common design or plan evidence is independently admissible to establish an inference that if the defendant committed the other acts, he committed the act charged. This is exclusive of the issues of intent and identity.

The area of similar offenses is not one which lends itself to crystal clarity in either judicial thinking or judicial writing. Justice Jefferson in his Evidence Benchbook states that ". . . the decided cases *cannot be justified,* distinguished, or rationalized with any degree of reason, consistency, or symmetry." (At p. 267 [original italics].)

While much judicial literature is inclined to refer to the lack of relevancy when discussing this type of evidence, Wigmore takes a much more practical approach when he observed that this evidence is rejected not because of its lack of relevancy but because it has *too much* relevancy. "It may almost be said that it is because of this indubitable relevancy of such evidence that it is excluded. It is objectionable, not because it has no appreciable probative value, but because it has too much." (1 Wigmore on Evidence (3d ed. 1940) § 194, p. 646.) Thus, such evidence is excluded not because it lacks relevancy, but for reasons of policy.

For reasons of policy, the general rule has evolved that evidence that the defendant has committed other crimes is inadmissible if offered

solely to prove criminal disposition on his part. (Evid. Code, § 1101, subd. (a).) However, the exceptions (Evid. Code, § 1101, subd. (b)) have become so numerous that, as Witkin notes, the suggestion has been made that the true rule could be more realistically stated in an affirmative form: "That evidence of other crimes is admissible whenever it is relevant to a material issue, and that it should be excluded only where its sole purpose and effect is to show the defendant's bad moral character (disposition to commit crime)." (Witkin, Cal. Evidence (2d ed. 1966) p. 300.) In practical terms this actually means that the defendant always starts his discussion with a quotation from Evidence Code section 1101, subdivision (a) and the Attorney General starts his with a quotation from Evidence Code section 1101, subdivision (b).

Nevertheless for sound policy reasons, such evidence must be received with extreme caution. (*People* v. *Kelley,* 66 Cal.2d 232, 239 [57 Cal.Rptr. 363, 424 P.2d 947].) It is obvious that such evidence has certain inherent dangers and the court must carefully weigh its probative value against its prejudicial effect. (Evid. Code, § 352.) *People* v. *Cramer,* 67 Cal.2d 126 [60 Cal.Rptr. 230, 429 P.2d 582] and *People* v. *Kelley, supra,* make clear the purpose of the general exclusionary rule: (1) Prejudice to the defendant, (2) the problem of defending against uncharged crimes, and (3) judicial efficiency, i.e., the danger of becoming involved in time-consuming extraneous matters.

■ There appears to be no conflict or confusion as to the foundational requirements for a similar offense involving a third person in a sex case. They are (1) that the other offense be not too remote in time, (2) that it be similar to the charged offense, and (3) that it be committed on a person similar to the prosecuting witness. (*People* v. *Thomas,* 20 Cal.3d 457, 465 [143 Cal.Rptr. 215, 573 P.2d 433]; *People* v. *Cramer, supra,* at p. 129; *People* v. *Kelley, supra,* at p. 243.)

■ Here, Valerie's testimony clearly meets the foundational requirements. The defendant's daughter, Lee Ann, was being used as a procurer of young girls. When young girls arrived, they were undressed and placed in T-shirts. The defendant then undressed and clothed himself in his bathrobe. Then followed the routine with the dirty playing cards. Thus:

(a) These circumstances were not remote; they were practically simultaneous.

(b) They were committed on someone similar to the prosecuting witness.

(c) They contained sufficiently distinctive marks of defendant's unique methodology of satisfying his sexual demands with young girls. His routine had become as distinctive as his signature. He had established a characteristic behavior pattern with bizarre details of striking similarity. One might say that he was in a rut. The similarities met the requirements of *People* v. *Thomas, supra,* at page 465; *People* v. *Thornton,* 11 Cal.3d 738 [114 Cal.Rptr. 467, 523 P.2d 267]; *People* v. *Haston,* 69 Cal.2d 233 [70 Cal.Rptr. 419, 444 P.2d 91]; *People* v. *Cramer, supra,* or *People* v. *Kelley, supra.*

■ However, it is in the realm of the legal theory for admissibility—the relevance—of the similar offense that the cases have been in considerable disarray or, as Justice Jefferson says, "lack consistency or symmetry." However, this lack of consistency or symmetry appears only to exist in the Courts of Appeal. The Supreme Court has at all times been consistent. *Thomas,* its most recent effort, has placed the relevance of common scheme evidence in proper perspective and has done so in clear, concise, understandable terms.

*Thomas* held, "Ordinarily, evidence of a common design or plan would bear either on the issue of the defendant's *identity* as the perpetrator of the charged offense, or the defendant's *intent* to commit that offense. . . . In view of the fact, however, that the 'plan' exception is separately listed in Evidence Code section 1101, subdivision (b), in addition to 'identity' and 'intent' there may be additional applications of the exception." (Original italics.) (At p. 465.) Thus, such evidence is admissible if there is " '. . . some clear connection between that [prior] offense and the one charged *so that it may be logically inferred that if defendant is guilty of the one he must be guilty of the other.* Or as the matter is sometimes stated, the other offenses . . . are sufficiently similar and possess a sufficiently high degree of common features with the act charged where *they warrant the inference that if the defendant committed the other acts he committed the act charged.* [Citations.]' " (Italics added.) (At p. 465.) This is something more than merely proof of criminal disposition or propensity which is, of course, insufficient as the basis for admission of evidence of other offenses.

The above language is a direct quote from *People* v. *Cramer, supra,* 67 Cal.2d 126, 129-130.

In *Cramer,* the Supreme Court in a unanimous opinion, speaking through Justice Peters, said: "It is settled that evidence of other crimes is ordinarily admissible where it tends to show presence of a common design, plan, or *modus operandi,* and we recently recognized in *Kelley, supra,* that this rule applies to sex offenses committed with persons other than the prosecuting witness. We there pointed out that, although charges of sex offenses are often unreliable and particularly difficult to disprove, such evidence is admissible as showing a common scheme or plan where the offenses are not too remote, are similar to the offense charged, and are committed with persons similar to the prosecuting witness. (*People* v. *Kelley, supra,* 66 Cal.2d 232, 240-243.) [¶] Several decisions have held that the test of admissibility of evidence of another offense offered to prove common design, plan, or *modus operandi* is whether there is some clear connection between that offense and the one charged so that *it may be logically inferred that if defendant is guilty of one he must be guilty of the other.* Or as the matter is sometimes stated, the other offenses offered to prove pattern, scheme, or plan are sufficiently similar and possess a sufficiently high degree of common features with the act charged where *they warrant the inference that if the defendant committed the other acts he committed the act charged.* [Citations.] Other cases have spoken of a 'peculiar or characteristic behavior pattern' [citations], 'bizarre details' [citation] and 'striking similarities' [citations]." (Italics added.) (*People* v. *Cramer, supra,* 67 Cal.2d 126, 129-130; see *People* v. *Thornton, supra,* 11 Cal.3d 738, 756.)[1]

Thus, *Thomas, Cramer* and *Kelley* make it clear that common scheme, plan or design evidence has a viability independent of the issues of identity, intent or the other issues mentioned in Evidence Code section 1101, subdivision (b). (Actually, it could probably be conceptually articulated on the issue of identity, not the identity of the defendant as a human being but the identity of the defendant as the perpetrator of the charged crime.) In this respect, the Supreme Court has spoken clearly and unequivocally. In *Thomas, Cramer* and *Kelley,* common plan, scheme or design is admissible on the premise that if the two offenses are

[1]See also *People* v. *Ing,* 65 Cal.2d 603 [55 Cal.Rptr. 902, 422 P.2d 590], in which the defendant contended that the trial court had erroneously admitted testimony of three women concerning other offenses. The Supreme Court said at page 612: "It appears from the testimony of the women and of the prosecutrix that in each instance the woman saw defendant at his office as a patient, defendant gave her one or more shots and then had intercourse with her, and she would not have had intercourse with him had she not been under the influence of the drugs. In view of the striking similarities between the other offenses and the ones charged the evidence was relevant on the question of a common scheme or plan to commit rape and was properly admitted."

clearly connected, i.e., a sufficiently high degree of common features, the uncharged prior is admissible because it warrants an inference that if the defendant committed the other act, he committed the act charged. This rationale is without any identification or intent limitation.[2]

Therefore, language such as appears in *People* v. *Swearington,* 71 Cal.App.3d 935 [140 Cal.Rptr. 5] simply must be reappraised. In *Swearington,* at page 948, it was said: "The issue of a characteristic method, plan or scheme is simply another way of describing the issue of *identity,* since the highly distinctive marks of similarity between the other acts and the offenses charged in the information lead to the inference that the same person was the perpetrator of the charged offense and the other offenses or acts. . . . In the instant case, however, since the issue of defendant's identity is *not* contested by defendant, the evidence of the other acts committed by defendant have no relevancy under any theory of a common scheme, plan or modus operandi." (Original italics.)

It is clear that the trial court carefully exercised its discretion under Evidence Code section 352. We cannot say this was an abuse of discretion. After all, the jury had been exposed to evidence tending to show that the defendant had engaged in similar acts as described by the witnesses in the five counts of the information of which the defendant was acquitted. Valerie's testimony certainly had probative value. We cannot find that the court abused its discretion in holding that the probative value outweighed its possible prejudicial effect. Probably had the district attorney known of the Valerie incident when the complaint was filed, he would have simply filed a complaint in fifteen rather than fourteen counts and this issue would have never arisen.

Thus, since we find no abuse of discretion under Evidence Code section 352 and since the offense met the test of *Thomas* from the standpoint of similarity and lack of remoteness, it was admissible under

[2] *Thomas* went on to clarify issues of intent, impeachment and corroboration of the prosecutrix' testimony which issues are not here relevant since the evidence was admitted only on general plan, scheme or design, plus intent which will be discussed. It would unduly and unnecessarily lengthen this opinion to discuss the balance of *Thomas.* Although *Thomas* disapproved *People* v. *Creighton,* 57 Cal.App.3d 314 [129 Cal.Rptr. 249]; *People* v. *Kazee,* 47 Cal.App.3d 593 [121 Cal.Rptr. 221]; and *People* v. *Covert,* 249 Cal.App.2d 81 [57 Cal.Rptr. 220], on the issue of corroboration of the prosecutrix' testimony, such a ground still exists although limited by *Thomas.* However, in this case since this was not a ground for admission nor was the jury advised it could consider this evidence for that purpose, we need not discuss it.

general scheme or design inasmuch as it warranted the inference that if defendant committed that act, he committed the acts charged.[3]

■ (2) That the court erred in instructing that the evidence was admitted on the question of intent.

This is true. All parties conceded that intent was not an issue. There was nothing ambivalent about the defendant's described acts. Thus, the court erred in not striking that portion of CALJIC No. 2.50 which reads "the existence of the intent which is a necessary element of the crime charged."

---

[3]It appears to us that the editors of CALJIC could well redraft instruction No. 2.50 in order to properly reflect the various possibilities of common plan evidence. At present, CALJIC No. 2.50 reads as follows:

"CALJIC 2.50 [¶] EVIDENCE OF OTHER OFFENSES [¶] Evidence has been received tending to show that the defendant committed [a crime] [crimes] other than that for which he is on trial. [¶] Such evidence was not received and may not be considered by you to prove that he is a person of bad character or that he has a disposition to commit crimes. [¶] Such evidence was received and may be considered by you only for the limited purpose of determining if it tends to show: [¶] 1. The identity of the person who committed the crime, if any, of which the defendant is accused; [¶] 2. A motive for the commission of the crime charged; [¶] 3. The existence of the intent which is a necessary element of the crime charged; [¶] 4. That the defendant had knowledge of the nature of things found in his possession; [¶] 5. That the defendant had knowledge or possessed the means that might have been useful or necessary for the commission of the crime charged; [¶] 6. A characteristic method, plan or scheme in the commission of criminal acts similar to the method, plan or scheme used in the commission of the offense in this case. [¶] For the limited purpose for which you may consider such evidence, you must weigh it in the same manner as you do all other evidence in the case. [¶] You are not permitted to consider such evidence for any other purpose."

We suggest that paragraph 6 be modified as follows:

"6. A characteristic method, plan or scheme in the commission of criminal acts similar to the method, plan or scheme used in the commission of the offense in this case which would evidence [the existence of the intent which is a necessary element of the crime charged] [the identity of the person who committed the crime, if any, of which the defendant is accused] [a clear connection between the other offense and the one of which defendant is accused so that it may be logically inferred that if defendant is guilty of the other offense, he must be guilty of the crime of which he is accused]."

If this suggested instruction is given, the trial judge must, of course, strike out the irrelevant purposes. The judge must also not use the duplicative identity (paragraph 1) or intent (paragraph 3) provisions of CALJIC No. 2.50. When, for example, a judge allows common plan to show intent, it is common practice to give paragraph 3 on intent and paragraph 6 on common plan. There is no disclosure to the jury that paragraph 3 and paragraph 6 go together. To further confuse the situation, often times paragraph 4 or paragraph 5 will be given between paragraph 3 and paragraph 6. The suggested instructional approach eliminates that problem by disclosing to the jury exactly what use common plan has in the case.

As CALJIC No. 2.50 is now given, the common plan part carries no disclosure of what use the jury may make of common plan once it determines there is one.

In *People* v. *Swearington, supra,* 71 Cal.App.3d 935 at page 949, the court said, "In the giving of CALJIC Instruction No. 2.50, the trial court should be careful to limit the issues upon which such evidence is relevant and admissible by striking from the instruction those issues upon which the evidence is not admissible."

Of course, this is hardly man-bites-dog news. *Swearington* states little more than that which most careful trial judges have been doing for years. The editors of CALJIC warn in the Use Footnote of CALJIC No. 2.50 "[i]n using this instruction, inapplicable numbered paragraphs should be stricken." In this respect, we observe that no trial judge should ever give an instruction without reference to the Use Notes in CALJIC (or BAJI).[4]

*Swearington* did not pursue the analysis necessary to measure the existence of prejudice since reversal was required in that case for an unconnected reason. However, this case is hardly in the same category as *Swearington.* There, the court advised the jury that the similar offense came in on four separate issues, three of which were held on appeal not to be issues of the case. Here, the instruction was limited to two issues, plan and intent. The instruction was accurate insofar as plan was concerned and we cannot find that the jury was so confused by the erroneous inclusion of the issue of intent that the defendant suffered any injustice therefrom. It is highly improbable that any juror was confused by the failure to delete this sentence. Once the jury decided the girls were telling the truth, intent obviously became a nonissue. Inserting this sentence did not lead to any improper use of extraneous material. The instruction clearly stated that the jury was not to consider that evidence to prove that the defendant was a person of bad character or that he had a disposition to commit crime. We cannot find that sans this error it is reasonably probable that a different result would ensue. (Cal. Const., art. VI, § 13; *People* v. *Watson,* 46 Cal.2d 818 [299 P.2d 243].)

■ (3) That CALJIC No. 2.50 is an erroneous instruction since it uses the words "tending to show" that the defendant committed a crime.

Defendant launches a full scale attack on the opening sentence of CALJIC No. 2.50 (and inferentially on CALJIC No. 10.30) contending that the use of the words "tending to show" usurp the jury's prerogative.

---

[4]Neither should any trial judge ever instruct the jury until he has refreshed his recollection on the current *sua sponte* instruction situation by checking through Judge Phillip Richards' excellent article, entitled Criminal Law—Sua Sponte Instructions which appears as appendix A in CALJIC.

However, all this phrase does is to identify the item of evidence in question. One could just as easily substitute the word "indicating" or the phrase "purporting to show." The jury is quite aware that it does not have to believe any testimony. We cannot conceive of a juror rushing into the jury room crying, "the judge must think that the defendant committed the other act because he used the words 'tending to show' that the crime was committed." There is simply nothing in CALJIC No. 2.50 which even hints that the jury is divested of its general function of determining the truth or falsity of *all* evidence presented.

In making this contention, the defendant relies on *People* v. *Albertson,* 23 Cal.2d 550 [145 P.2d 7], in which Justice Carter authored an opinion which stated that a similar introductory statement in an instruction on a prior act invaded the province of the jury. In *People* v. *Harris,* 71 Cal.App.3d 959 [139 Cal.Rptr. 778], the Court of Appeal held that Justice Carter's comment was only written for a three-man plurality and was therefore not binding. We agree.[5] Insofar as this issue is concerned, we are inclined to agree with the statement of the Attorney General that only a mentally incompetent would not have seen that Valerie's testimony "tended to show" that the defendant had committed a crime.

■ (4) That the court should have instructed the jury on the standard of proof as to the similar offenses.

We are unpersuaded. The court has no duty to advise the jury that the standard of proof for the similar offense is that it be established by a preponderance of the evidence. All this would do would be to inject into the trial a concept unnecessary to the jury's determination and possibly dangerous to the defendant. The jury was thoroughly instructed that the prosecution must establish each and every element of the case beyond a reasonable doubt and to a moral certainty. Injecting any other concept would not only be confusing and nonproductive, it would be potentially dangerous to the defendant. If a defendant wants such an instruction, he should ask for it—and few will.

[5]We would note that the defendant's requested instruction on alibi (CALJIC No. 4.50) contains the same introductory phrase "the defendant in this case has introduced evidence *tending to show* that he was not present. . . ." However, the editors of CALJIC would be well-advised to reexamine instructions such as CALJIC Nos. 10.35, 10.12 and 10.54 each of which have the introductory phrase to the effect that evidence was received that the defendant had "engaged" in some kind of misbehavior. In the meantime, judges faced with this situation could well avoid an issue on appeal by simply inserting the word "alleged" when appropriate.

■ (5) That the court erred in refusing the defendant's two instructions to the effect that the jury was to view with caution the testimony of the defendant's victims.

The defendant requested CALJIC Nos. 10.37 and 10.44 to the effect that these charges are easy to make but difficult to defend against. The court rejected each, giving as authority *People* v. *Rincon-Pineda*, 14 Cal.3d 864 [123 Cal.Rptr. 119, 538 P.2d 247]. The court's ruling was correct.

However, the defendant now contends that the trial court should have modified the instructions in such a way as to make the instructions fit the facts of this case. *People* v. *Thomas, supra,* 20 Cal.3d 457 is helpful. There, the defendant contended that the court erred in refusing to instruct the jury in a Penal Code section 288 prosecution: " 'You should examine with caution the testimony of children of tender years upon with [*sic*] and with whom the lewd or lascivious act is alleged to have been committed.' " The court noted that under *Rincon-Pineda* this instruction was improper. The court pointed out that *Rincon-Pineda* left open the possibility of developing " 'new instructions designed to enhance juries' consideration of particular types of evidence, such as the testimony of a child of tender years.' " (At p. 470.) However, the instruction requested in *Thomas* and in this case improperly assumes that the testimony of all young children in sex cases is inherently suspect. *Thomas* held to the contrary. *Thomas* did hold that under the rationale of *Rincon-Pineda*, ". . . it would be appropriate in certain cases for the trial court, in its discretion, to focus the jurors' attention upon specific aspects of the evidence which require the exercise of caution in appraising the testimony of a particular child witness." (At p. 471.) However, any instruction pertaining to this concept insofar as it affects the credibility of a particular witness would have to be requested under *People* v. *Sears,* 2 Cal.3d 180 [84 Cal.Rptr. 711, 465 P.2d 847]. We can put just so much responsibility upon the trial judges. As has been said, while we demand prescience of our trial judges, we do not demand omniscience. (*People* v. *Rodriguez,* 274 Cal.App.2d 487 [79 Cal.Rptr. 187].)

■ (6) That the trial court erred in not giving CALJIC No. 2.27.

This instruction reads: "Testimony which you believe given by one witness is sufficient for the proof of any fact. However, before finding any fact to be proved solely by the testimony of such a single witness, you should carefully review all the testimony upon which the proof of

such fact depends." The use note to this instruction reads: "This instruction should be given sua sponte in every criminal case in which no corroborating evidence is required and the proof of any fact depends on the testimony of a single witness."

Here, there was corroboration of the statements of each of the prosecuting witnesses. Actually, the defendant would have been the one who would have been most directly affected from a negative standpoint by the giving of this instruction since his position was to a great extent dependent upon his uncorroborated testimony. There was no error.

 (7) That the court abused its discretion in failing to excuse a juror for cause.

After the trial commenced, a juror advised the court that she worked in the same school district where the girls were enrolled. She did not work in the same school. She did not know any of the people involved. The court went over the matter carefully and upon being advised by the juror that she could be fair, elected to retain her. We find no abuse of discretion. The juror expressed some discomfiture, but no inability to judge objectively.

(8) Prosecutorial misconduct.

We need not repeat the well-known rule re the necessity for objection and admonition except for closely balanced cases where the remarks are such as to render an admonition useless.

The complaints are:

 (a) A complaint that the district attorney during closing argument stated that to believe the defense it was necessary to believe that the police officer who took the statement of Lee Ann committed perjury. There was no objection. From this the defendant's present counsel argues that this was a reprehensible tactic since it pitted a well-respected institution, i.e., the police department, against the defendant. We are loath to say that the police department is such a well-respected institution that membership therein gives any police officer standing in a court. To the contrary, in most juries one will find most jurors definitely take a contrary view. There was no objection. This is understandable. There was nothing objectionable.

■ (b) That the district attorney attributed to the defense a technique of smearing the victims and their parents.

While the district attorney's comments in this respect may have been unkind, we cannot find them to be either reprehensible or prejudicial.

■ (c) A comment that it is difficult to get justice any more because of the technicalities of the law. This comment was improper, but far from prejudicial.

■ (d) A remark that it is common knowledge that child molesters go free.

At first blush it appears to be a reprehensible comment. However, taken in context, such is not the case. In retorting to the prosecution's argument that five or six young girls would not make up stories of such explicitness, defense counsel discussed the testimony of young children in 17th Century Salem. The attorney noted that children made up stories about adults and caused their torture and death. So far, so good. Then defense counsel decided to bring the matter down to the current time and began to wave around a newspaper article saying that stuff goes on at present because "April 1975 from the 'Daily Pilot' [6]—" At which point there was an objection. After a conference at the bench, the court told defense counsel it was improper to read the newspaper article but that he could go ahead and argue that innocent people were being convicted as long as he did not refer to specific facts or unauthenticated accounts. Defense counsel then took a cheap shot: "Thank you, your Honor. I'm not able to read from newspaper articles to you, ladies and gentlemen, about innocent people being convicted—" At this point the district attorney again objected and the court advised the jury that counsel was being prohibited from reading specific facts and instances of such circumstances, but that "[r]eferences, however, to the fact that innocent people are on occasion convicted certainly can be made by counsel." Counsel then went on and argued that it was a matter of common knowledge that innocent people get convicted and sent to prisons on child molest crimes because several children made up allegations and because it was hard for juries to believe that young children would make up such stories. In response to this, the district attorney said, "I would merely point out to you it's also common knowledge that guilty child molesters get off, too. . . . It's common

---

[6]The Daily Pilot is a well-known Orange County newspaper.

knowledge that guilty people get off on this kind of crime, too, particularly in a child molest case where the eyewitnesses, as we said at the beginning, are little kids whose vocabulary is not as extensive as ours, whose ability to communicate is not as good as ours, kids who may use the wrong word in trying to convey something particularly when they have to testify so many times."

Thus, taken in context, there was nothing improper in the district attorney's remark. It was simply tit-for-tat—that some guilty men are acquitted and some innocent men are convicted. This exchange added nothing to the jury's general knowledge and could not possibly have contributed to the result reached.

Judgment affirmed.

McDaniel, J., and Morris, J., concurred.

Appellant's petition for a hearing by the Supreme Court was denied June 9, 1978.