[Crim. No. 34050. Second Dist., Div. Five. Dec. 6, 1979.]

THE PEOPLE, Plaintiff and Respondent, v.
CHALLEN WILLS-WATKINS, Defendant and Appellant.

COUNSEL

Carolyn Froeberg, under appointment by the Court of Appeal, for Defendant and Appellant.

George Deukmejian, Attorney General, Robert H. Philibosian, Chief Assistant Attorney General, S. Clark Moore, Assistant Attorney General, Howard J. Schwab and William R. Pounders, Deputy Attorneys General, for Plaintiff and Respondent.

OPINION

HASTINGS, J.—In a six-count information defendant was charged with three violations of Penal Code section 207 (kidnaping), two violations of Penal Code section 288a, subdivision (c) (oral copulation) and one violation of Penal Code section 261, subdivision 3 (rape). It was further alleged that in the commission and attempted commission of all of the above offenses, defendant used a firearm. Defendant pled not guilty to all counts and denied the firearm use allegation. Trial was by jury. Defendant was convicted of all counts and the firearm use allegations were found to be true. He was sentenced to state prison for three years on the rape count, with the remaining counts to run concurrently. His term was enhanced by two years for use of the firearm. Defendant now appeals, claiming (1) the court abused its discretion by admitting into evidence the testimony of a modus operandi witness, and (2) prosecutorial misconduct denied him a fair trial.

On the evening in question, December 4, 1977, Victoria B., Kelly C. and Tonia W. visited several bars in the City of Glendale. At the Round Robin bar they encountered defendant. He initiated a discussion about the Hillside Strangler killings; there was some talk about what a girl could do to protect herself.

Later on defendant mentioned something about a ride home and Tonia agreed to give him a lift. He said he wanted to be dropped off last, but Tonia said it would be easier if he was dropped off first.

After leaving the bar, the three women and defendant went to a coffee shop. They left the coffee shop at around 2:45 or 3 a.m. and

followed defendant's directions to his home. Victoria testified he directed them in an "awkward direction."

Upon arrival, defendant said, "Wait here. I want to give you something. I want to give you a couple of joints for taking me home." The women waited. Tonia was in the driver's seat, Victoria in the right front, and Kelly in back. They sat with the motor running and the lights on.

After 10 or 15 minutes, defendant returned. Tonia lowered her window. Defendant pulled a gun out and put it in Tonia's face. He told her to park her car. He opened the door and pointed the gun at her ribs. She floored the accelerator in an attempt to leave, but defendant climbed in and put his foot on the brakes and his hand on the wheel.

Defendant ordered the women up to his apartment. Once there, he tied up Victoria and Kelly in the living room. Defendant took Tonia to the bedroom where he raped her and forced her into two acts of oral copulation.

Afterwards, defendant returned to the living room. He untied the two other women. He said, "I don't know what I'm going to do now. I don't want to pay for this." He had the gun in his pants. Kelly promised they wouldn't tell the police when he asked if they would.

Tonia agreed to take him to work as he requested because he still had the gun. On their way she said she needed gas and they stopped at a gas station. While there, defendant walked away and the three women took off. They went directly to the police station and Kelly spoke first, saying they had been kidnapped and Tonia had been raped.

Tonia was examined at Glendale Memorial Hospital and the doctor concluded that it was certainly a possibility that she had been raped.

On December 7, 1977, the police served a search warrant on defendant's home. They discovered a gun between the bed sheets which was subsequently identified by Tonia as looking like the one he used. They also found a white cord similar to the one used on Victoria and Kelly.

Denise B., defendant's girl friend at the time of trial, testified that she saw defendant at the Round Robin about two weeks before the night in question and that he asked her for a ride home. She had seen

defendant before at the Round Robin and agreed to take him home. When they arrived at his apartment, Denise said "Good night" with the motor running, but defendant wanted her to come upstairs and he became "overly aggressive." He reached over and turned the ignition off, taking the key out. He tried to push her out of the car and she wrapped her arms around the wheel to prevent him from succeeding. She cried and was upset. She was worried about being raped. Finally, he stopped trying to coerce her and said something like, "I didn't mean to hurt you, you are a lady."

While sitting in the car they talked about sex; they talked about his wanting to tie her up in his house. At some point he touched her breasts or attempted to do so. Denise drove off at around 3 a.m.

After the incident Denise went to the police because this was during the Hillside Strangler investigation and a friend told her "everybody should be checked out." Denise testified she would like her boy friend, defendant, to be acquitted and denied making certain statements to the police about her evening with defendant.

The prosecution then called Officer Lorraine Curry who testified that she interviewed Denise concerning the report she had made against the defendant. Officer Curry recounted the following statements made by Denise during that interview: Denise said that when she took defendant home and refused to go upstairs, he became violent and grabbed her neck and applied pressure to her throat. During the struggle a light came on in the neighborhood and neighbors came out on their porch; he told her not to say or do anything and he appeared frightened. At some point his attitude suddenly changed and he said, "I'm sorry, I didn't mean to hurt you, you're a lady. *I thought you were like the rest of them.*" (Italics added.) He told Denise that women abused him and didn't treat him right. Defendant told her not to tell anyone about what happened or she would be in trouble.

Defendant testified on his own behalf. According to him, he and Tonia had sexual relations prior to the night in question. Defendant claimed that on the night of the incident, when they met at the Round Robin, Tonia expressed an interest in buying his gun for protection from the Hillside Strangler, and that they discussed having sexual intercourse that evening. He testified further that when they arrived at his

apartment he brought out the gun to show it to Tonia, that the women went upstairs to "smoke the numbers," that Tonia consensually participated in the sexual acts, and that he tied Kelly's left thigh to Victoria's right thigh as part of a joke.

Defendant said he knew the police were looking for him several days later but did not make direct contact with them until April, four months later. He was hoping that they would catch the Hillside Strangler first.

■ Defendant's first contention is that the court abused its discretion by admitting the testimony of a modus operandi witness. As we note above, Denise and Officer Curry testified regarding a prior evening in which defendant attempted to coerce Denise up to his apartment. The gist of defendant's argument appears to be that the prejudicial effect of this testimony outweighed its probative value because the testimony didn't go to prove a prior rape,[1] and because there was little similarity between the uncharged act and the charged offenses. (Evid. Code, § 352.)

It is established by case law that if two offenses or acts have a sufficiently high degree of common features, the uncharged prior is admissible because it warrants an inference that if defendant committed the former act, he committed the crime charged. (*People* v. *Haslouer,* 79 Cal.App.3d 818, 827-828 [145 Cal.Rptr. 234].) We conclude that although there is a difference in defendant's degree of success with Denise and Tonia, there was a sufficient similarity between the two evenings to make the testimony admissible. Defendant's conduct toward Denise, Tonia, Victoria and Kelly was similar in the following respect: (1) he at least casually knew the victims before the incidents, (2) he met them at the same bar, (3) he asked for a ride home, (4) he tried to force them up to his apartment when they refused to go, (5) he warned them to keep quiet about the incidents, and (6) he either discussed tying them up or did so in fact. Admittedly, defendant did not get Denise into his apartment or succeed in sexually attacking her, but this failure could be attributed to defendant's lack of a weapon in face of Denise's resistance and the neighbors' proximity rather than to his good intentions. (*People* v. *Pendleton,* 25 Cal.3d 371, 377 [158 Cal.Rptr. 343, 599 P.2d 649].)

---

[1] A prior act need not be a crime to be admissible under Evidence Code section 1101. (*People* v. *James,* 62 Cal.App.3d 399, 407 [132 Cal.Rptr. 888].)

■ Defendant's second contention on appeal is that he was denied a fair trial when during the course of trial the prosecution inferred that he might be the Hillside Strangler.[2] This contention is meritless. Not only was it apparent defendant had been dismissed as a suspect in those stranglings,[3] but also the acts charged were not similar to those much-publicized crimes.

The judgment is affirmed.

Ashby, J., concurred.

**KAUS, P. J.,** Concurring.—Obedient to the Supreme Court's decisions in *People* v. *Thomas* (1978) 20 Cal.3d 457, 464-467 [143 Cal.Rptr. 215, 573 P.2d 433], and *People* v. *Pendleton* (1979) 25 Cal.3d 371, 376-378 [158 Cal.Rptr. 343, 599 P.2d 649], I concur.

The rule of the common law, codified in section 1101 of the Evidence Code, is that evidence of other crimes is not admissible where the proof shows only the defendant's propensity or disposition to commit the crime charged. In *People* v. *Zackowitz* (1930) 254 N.Y. 192, 197 [172 N.E. 466]. Chief Judge Cardozo noted that the effect of this rule is that "[in] a very real sense a defendant starts his life afresh when he stands before a jury, a prisoner at the bar." Reasonable persons may fret over the wisdom of permitting an incorrigible scoundrel to "start his life afresh" when charged with the umpteenth repetition of some particular offense.[1] In any event, in California they need not worry if the accused is charged with a sexual offense and the other offenses were not too remote in time, were similar to the offense charged and committed with or upon persons similar to the prosecuting witness. (*People* v. *Thomas, supra,* 20 Cal.3d at p. 465.) This is our rule, although by statute we must and by case law we should follow the orthodox common law rule as recognized by Cardozo.

[2] He notes that the topic of the Hillside Strangler was raised 16 times during the course of trial. The court has reviewed the record, and it is clear that defense counsel and defendant himself were responsible for at least 6 of the 16 times. And, in at least six or more instances the topic of the Hillside Strangler was independently raised by a witness. The questions of defense counsel and the answers of defendant and other witnesses can hardly be chalked up as misconduct by the prosecutor.

[3] Firstly, the prosecutor stressed the past tense when he asked Officer Curry, "*At one time was* [defendant] *suspected* of being the Hillside Strangler, or possible suspect?" (Italics added.) Secondly, Officer Curry's testimony made it clear she did not pursue defendant for his connection with the Hillside Strangler slayings but rather for his own crimes; it is not logical to argue the jury believed defendant was considered the strangler since they knew the police focus was elsewhere.

[1] In 1 Wigmore on Evidence (3d ed. 1940) section 193, the author describes how differently other civilized systems of criminal jurisprudence handle this type of evidence.

What worries me is not so much the rule announced in *Thomas,* as the fact that we now have two irreconcilable lines of cases on the admissibility of other offenses to show conduct on the occasion under scrutiny, where the other offenses prove no relevant issue except the defendant's disposition. I had thought that after much confusion in the cases, the law on the subject was finally settled in *People v. Haston* (1968) 69 Cal.2d 233 [70 Cal.Rptr. 419, 444 P.2d 91], where the Supreme Court made it clear that evidence of other crimes is only admissible where it is relevant to a contested issue in the litigation. (*Id.,* p. 244.) Further, *Haston* pointed out that where so-called modus operandi evidence is admitted on à contested issue of identity, the modus operandi must be distinctive indeed. (*Id.,* p. 246.) In footnote 22 of the *Haston* opinion the Supreme Court specifically disapproved or overruled about seven cases, but indicated clearly that the list was not exhausted.

Any lingering doubt that *Haston* applied in so-called "sex cases" was dissipated in *People v. Thornton* (1974) 11 Cal.3d 738, 755-756 [114 Cal.Rptr. 467, 523 P.2d 267].)

Assuming that the court truly meant all it said in *Haston* and *Thornton,* three cases which were impliedly overruled in footnote 22 of *Haston* had to be *People v. Ing* (1967) 65 Cal.2d 603, 612 [55 Cal.Rptr. 902, 422 P.2d 590]; *People v. Kelley* (1967) 66 Cal.2d 232, 238-243 [57 Cal.Rptr. 363, 424 P.2d 947], and *People v. Cramer* (1967) 67 Cal.2d 126, 129-130 [60 Cal.Rptr. 230, 429 P.2d 582]. Each one of those cases clearly violates the later dictates of *Haston* and *Thornton: Ing* and *Cramer* because they admit modus operandi evidence on nonexistent issues of identity; *Kelley* because it suggests, by dictum, that inadmissible evidence of disposition can be smuggled into the record in disguise by giving it a "common scheme or plan" label.[2]

It was not to be. Like so many Phoenixes, *Ing, Kelley* and *Cramer* rose from the ashes of *Haston* and *Thornton* when the Supreme Court decided *People v. Thomas, supra.* I might add that if *People v. Thomas* left any doubt on the question whether the prior offense had to display

---

[2]The common scheme or plan referred to in *Kelley* was not the "'larger continuing plan, scheme, or conspiracy, of which the present crime...is a part.'" (*People v. Sam* (1969) 71 Cal.2d 194, 205 [77 Cal.Rptr. 804, 454 P.2d 700].) (E.g., (*People v. Glass* (1910) 158 Cal. 650 [112 P. 281].) It was, rather, nothing but the defendant's "distinctive, characteristic method of committing crimes." (*People v. Thomas, supra,* 20 Cal.3d at p. 465.)

a distinctive modus operandi, it was certainly dispelled in *People v. Pendleton, supra,* 25 Cal.3d 371, where the Supreme Court, in comparing three forcible rapes mentioned, along with other commonplace similarities, that in each case "defendant physically attacked the victim." (*Id.,* p. 377.)[3]

Pendleton thus exposes what I submit to be the fundamental mistake of *Kelley,* perpetuated in *Thomas*: that there is a difference between "disposition" and "propensity"—issues on which evidence of other offenses is inadmissible—and "common scheme or plan" when used to mean the defendant's way of committing the crime in question. To be sure, when there is a genuine issue of identity the evidence of other offenses, if distinctive enough, is admissible whether we call it common scheme or plan or modus operandi or whatever. If, however, there is no such issue—as in this case—it should not be admissible whatever label we choose to give it.

This does not mean that the *Kelley-Thomas* rule is a bad rule. As I said at the outset reasonable men can take issue with the entire concept of keeping the accused's criminal propensities from the jury. I do, however, suggest that it cannot co-exist with *Haston-Thornton* and cannot really be reconciled with the statutory mandate of section 1101 of the Evidence Code.

A petition for a rehearing was denied December 28, 1979, and appellant's petition for a hearing by the Supreme Court was denied January 30, 1980.

---

[3]The court also noted that "none of the victim's property was taken." It is obvious that the number of "negative similarities" of this sort is only limited by the imagination of the writer.