422 A.2d 164

JOHNSTON TRUCK RENTAL COMPANY, INC.

v.

FOWLER–McKEE COMPANY; Graziano Construction; and Aetna Casualty & Surety Company.

Appeal of FOWLER–McKEE COMPANY at 50.

Appeal of GRAZIANO CONSTRUCTION and Aetna Casualty & Surety Company at 84.

Superior Court of Pennsylvania.

Argued Nov. 15, 1979.

Filed Oct. 3, 1980.

Robert W. Beilstein, Pittsburgh, for Fowler–McKee, appellant at No. 50 and appellee at No. 84.

Thomas Levendos, Pittsburgh, for Johnston Truck Rental, appellee.

G. Robert Moore, Pittsburgh, for Graziano Const. and Aetna Cas. & Sur., appellee, at 50, and for appellant at 84.

Robert A. Cohen, Pittsburgh, for Charles Sanders, participating party.

Before SPAETH, HOFFMAN and VAN der VOORT, JJ.

SPAETH, Judge:

These appeals arise from an order dismissing exceptions and entering judgment on a verdict entered by a judge sitting without a jury in an action in assumpsit.

The plaintiff below was Johnston Truck Rental Company, a trucking company; the defendants were Fowler–McKee Company, Inc., an excavating company; Graziano Construction Company, Inc., a general contractor; and Aetna Casualty and Surety Company, Graziano's surety. Graziano was general contractor for the construction of the Professional Quadrangle at the University of Pittsburgh; Fowler–McKee was one of Graziano's subcontractors, and was to do the excavating and backfill. Fowler–McKee and Johnston entered into a written agreement under which Johnston was to remove dirt from the site. The present action is to enforce that agreement.

The lower court entered a verdict for $22,521 with interest from June 1, 1974, in favor of Johnston, and against Fowler–McKee, Graziano, and Aetna. Since Fowler–McKee had agreed to indemnify Graziano, the court entered a verdict in the same amount, plus counsel fees and expenses, in favor of Graziano and against Fowler–McKee. Fowler–McKee had

filed three counterclaims against Johnston. On two of the counterclaims, the court entered a verdict in favor of Johnston; on the third, it entered a verdict of $450 in favor of Fowler–McKee.

Fowler–McKee, Graziano, and Aetna filed exceptions to the lower court's findings. On December 19, 1978, the lower court sustained the exceptions to the finding that Fowler–McKee had breached its contract with Johnston on June 1, 1974, and modified the finding and the verdict based on the finding to correct the date to May 28, 1974. The court dismissed all other exceptions. Fowler–McKee, Graziano, and Aetna have now appealed.[1]

■ It is settled that "[w]hen a trial judge sits without a jury his findings of fact ... have the weight of a jury verdict and cannot be disturbed on appeal unless they lack sufficient and competent evidential support. In such case, the party favored by the finding is entitled to have the evidence viewed in the light most favorable to him and to have all conflicts in the testimony resolved in his favor." *Darlington Brick and Clay Products, Inc. v. Aino*, 225 Pa.Super. 186, 187, 310 A.2d 401, 402 (1973). *See also Courts v. Campbell*, 245 Pa.Super. 326, 369 A.2d 425 (1976); *Krobot v. Ganzak*, 194 Pa.Super. 49, 166 A.2d 311 (1960). So viewed, the evidence in this case may be summarized as follows.

Johnston began hauling material from the construction site on March 5, 1974. Under its agreement with Fowler–McKee,[2] Johnston was to remove an estimated 53,976 cubic

1. Graziano and Aetna argue that if we reverse the judgment in favor of Johnston and against Fowler–McKee, we should reverse the judgment in favor of Johnston and against Graziano and Aetna because their liability was only as sureties for amounts owed by Fowler–McKee. Since we do not reverse the judgment against Fowler–McKee, Graziano and Aetna's liability remains. As noted, however, the lower court found in favor of Graziano and against Fowler–McKee in the same amount as its verdict for Johnston against Fowler–McKee, plus counsel fees and expenses.

2. The agreement between Johnston and Fowler–McKee was not actually signed by the parties until sometime in April, well after the work began, but this did not affect its validity. Johnston argues that the parties did not intend to be bound by the written agreement but

yards of "excess material". It appears that Fowler–McKee had sent a copy of the site plan to an engineering firm, N.T. at 218, 7/12/77, and the 53,976 figure represented the firm's estimate of the amount to be removed, plus an additional estimate made by two officers of Fowler–McKee. N.T. at 218, 7/12/77. In addition, Johnston was to "accept excess materials in excess of the 53,976 cubic yards estimated if required by [Fowler–McKee] in order to complete its contract obligations," and was to ensure that "mud, dirt or other such materials [were] not deposited in or about the public roadways leading from the excavation site to the disposal site." Fowler–McKee agreed to pay Johnston $1.15 for each cubic yard of excess material removed. The agreement was to "continue in force until such time as the site preparations contemplated [were] complete and all excess materials [were] removed and hauled to the disposal site."

On March 30, 1974, Johnston billed Fowler–McKee for $28,869 for work performed during March. Although the bill contained no estimate of the amount of excess material removed, Fowler–McKee paid it without questioning Johnston. On May 1, Johnston billed Fowler–McKee for $26,247 for work performed during April. Again, although the bill contained no estimate of the amount of excess material removed, Fowler–McKee paid it without questioning Johnston. On May 20, Fowler–McKee informed Johnston that the removal of excess material was, for the time being, complete, but that Johnston would be required to return to the site.[3] On May 21, Johnston and the independent truckers who had worked for it left the site. Soon after May 21, Johnston sold its small fleet of trucks. N.T. at 30, 7/12/77.

by an earlier oral understanding. The agreement provides, however, that it represents the complete agreement of the parties.

3. There was a direct conflict in the testimony on this point. Johnston testified that on May 20, McKee told him that the job would be over the next day. N.T. at 64, 7/12/77. McKee testified that he did not tell Johnston that the job would be over permanently, but only temporarily until additional grading of the property had been done. N.T. at 277, 7/12/77. The lower court found McKee's testimony on this point more credible. Slip op. at 16.

On May 28, Johnston submitted a bill to Fowler–McKee for $19,505 as the balance owing at that point. The bill contained a total yardage figure equal to the estimate contained in the parties' agreement, *i.e.*, 53,976 cubic yards, plus an extra 6,000 cubic yards[4] reflecting Johnston's removal of a muck pile that had not been included in the engineering firm's original estimate. The balance due was calculated on the basis of a rate of $1.25 per cubic yard, instead of $1.15 per yard, because Johnston's bookkeeper, Mary Lau, thought there had been a verbal agreement between Johnston and Fowler–McKee to raise the price. N.T. at 184, 7/12/79. Fowler–McKee paid Johnston $15,000, which was all Fowler–McKee had at that point. N.T. at 25, 7/12/77.

During June, Fowler–McKee tried several times to get Johnston to return to the site. N.T. 279, 7/12/77. Johnston promised to "look the situation over," N.T. at 280, 7/12/77, but never did, N.T. at 280, 7/12/77, and Fowler–McKee finally hired other truckers to remove the additional excess material. Fowler–McKee's bookkeeper, Mary Cummings, testified that the expense of paying these truckers, who were employed at an hourly rate, was approximately $43,-000. N.T. at 386, 7/12/77.

On July 5, Johnston billed Fowler–McKee for an amount which was adjusted downward to $22,521 at the time of trial. The bill, which Fowler–McKee refused to pay, reflected Johnston's claim that it had hauled a total of 83,206 cubic yards of excess material from the site. N.T. at 402, 7/12/77.

At trial, Johnston's bookkeeper testified that she billed Fowler–McKee on the basis of the number of trucks used in a given period, and that she assumed that each tandem truck used on the job held 14 cubic yards of excess material, and each tri–axle truck, 18. She said that Johnston instructed

4. At trial, Johnston brought out that the 6,000 cubic yard figure was Fowler–McKee's estimate, not Johnston's estimate. N.T. at 264, 7/12/77. Johnston argued throughout the trial that the proper figures should have been 14 yards per tandem truck and 18 yards per tri–axle. N.T. at 170, 7/12/77.

her to use these figures, N.T. at 170, 7/12/77, and several witnesses attested to their plausibility, N.T. at 85, 7/12/77; N.T. at 116, 7/12/77; N.T. 135, 7/12/77. Nevertheless, Fowler–McKee vigorously disputed the figures, suggesting that it was more likely that each tandem held 8 to 10 cubic yards, and each tri–axle, 12. N.T. at 199, 7/12/77; N.T. at 226, 7/12/77. One of Fowler–McKee's witnesses was William Marlowe, who had made the estimate of yardage upon which the parties' agreement was based. He testified that he regarded Johnston's estimate as a "physical impossibility." N.T. at 370, 7/12/77. He conceded, however, that the most accurate way to measure the cubic yardage of the material hauled away was to survey what remained in the excavation afterwards, and that that had not been done. N.T. at 370, 7/12/77. Fowler–McKee also introduced evidence that it had expended $3,576.04 to clean up the public roads near the site while Johnston was employed there.

The lower court found in favor of Johnston on its claim for $22,521 because it believed Johnston's estimates of the amount of excess material hauled away to be more credible than Fowler–McKee's. While acknowledging that Johnston was obligated to return to the site, because Fowler–McKee had made it clear on May 20 that there would be additional hauling, the court rejected Fowler–McKee's counterclaim for $29,064.66, the difference between what Fowler–McKee had to pay the other truckers and what it would have had to pay Johnston if Johnston had performed its contractual obligation, because, the court concluded, Fowler–McKee had materially breached the agreement by failing to pay the $22,521 bill. The court also rejected Fowler–McKee's counterclaim for $3,576.04, the cost of cleaning the streets near the site, on the ground that Fowler–McKee had not met its burden of proving that Johnston was solely responsible for the dirt.

–1–

Fowler–McKee's first argument is that by the reference in their agreement to "cubic yards" of "excess materials", the parties meant "yards in bank", or in the earth, and that its

measure of these materials was more accurate than Johnston's.

■ Although an ambiguous contract is generally interpreted against the party that drafted it, Restatement of Contracts (Second) § 232 (Tent. Draft No. 5 Rev.Ed. 1973), Fowler–McKee in this case, nevertheless, there is a good deal of evidence in support of Fowler–McKee's interpretation. It was established that the 53,936 cubic yard figure in the parties' agreement was based on a survey made by a professional engineer. N.T. 355–368, 7/12/77. It was also established that although Johnston did not see this particular survey, N.T. at 38, 7/12/77, it knew that the custom of the trade was that when contractors bid a job, they estimated the amount of material to be removed on the basis of a plan or survey of the area. N.T. at 44, 7/12/77. It may therefore be reasonably concluded that both parties intended the term "cubic yards" to mean yards in bank, for the survey could have estimated the excess materials only in that form.

It does not follow from this conclusion, however, that we should reverse the lower court, for it seems to us that the lower court agreed with Fowler–McKee's interpretation of the agreement, at least *arguendo.* The lower court's opinion states:

> [Fowler–McKee alleges that the yardage estimates utilized by Johnston were inflated and has urged the Court to adopt estimates based on the yardage when on the ground. The Court finds that the witnesses presented by Johnston were credible in their method of determining the capacity of the Johnston trucks. The trucks were loaded to the greatest capacity possible by Fowler employees and the calculation based utilized by Johnston was sound. Johnston allowed a sufficient subtraction for special voids or expansions. Slip op. at 16.

We understand the lower court to say that Johnston's measure of the excess material was accurate because it adequately discounted any swellage that might have occurred after the material was excavated from its natural state, or stated

more succinctly: assuming that the excess material was to be measured in its natural state, Johnston did so accurately.

■ When the issue is reduced to whether Johnston or Fowler–McKee more accurately measured the excess material removed, we are inclined not to disturb the lower court's finding that Johnston did. The trial was essentially a credibility battle, with each side's witnesses suggesting that the estimates by the other side's witnesses were inaccurate. Judging the credibility of witnesses is peculiarly the province of the trial court, when, as here, it is the factfinder. *Lawner v. Engelbach*, 433 Pa. 311, 249 A.2d 295 (1969).

Moreover, the weight of the testimony favored Johnston. Johnston conceded that it would be difficult to measure the excess material by the truckload because after it had been excavated from its natural state, it would swell. N.T. at 46, 7/12/77. Swelling would occur because after the material had been excavated, it would be airier or looser, than in its natural state. N.T. at 200, 250, 7/12/77. Also, swelling might occur from moisture and rain received by the material while piled on the ground awaiting removal. N.T. at 250, 7/12/77. Johnston pointed out, however, that "90% of [the material] was gouged out and put on the trucks." N.T. at 75, 7/12/77. Therefore, there was little opportunity for swelling because of moisture or rain. Swelling attributed to the material being looser after it had been excavated and loaded onto a truck was allowed for in Johnston's estimates. Slip op. at 16.

In addition, Fowler–McKee's calculations were not persuasive. Its witnesses testified that the usual method of *estimating* excess material removed in an excavation is to extrapolate from plans and surveys; they did not testify that this is an accurate method of *actually measuring* the material removed. Two of the witnesses testified that the best method of measuring the material removed is to survey the area before and after the excavation, N.T. at 349, 7/12/77; N.T. at 371, 7/12/77, but Marlowe, who had himself prepared the pre–excavation survey in this case, acknowledged that no post–excavation survey had been made. N.T. at 371, 7/12/77.

Thus, the lower court had to choose between a measurement based on the number of truck loads and an extrapolation from a survey. We think it was within the province of the court as fact finder to decide that the measurement based on the number of truck loads was the more accurate.

–2–

· ■ Fowler–McKee's second argument is that the lower court erred in denying its counterclaim for damages resulting from Johnston's refusal to return to the site and do further hauling.

It will be recalled that the lower court denied Fowler–McKee's counterclaim on the ground that by refusing to pay Johnston's bill, Fowler–McKee had breached the agreement. The lower court based this conclusion on its belief that Fowler–McKee had failed to pay the bill before it asked Johnston to return to the site and do the additional work. In fact, Fowler–McKee received the bill in July, about two weeks *after* it asked Johnston, and Johnston refused, to return and do the additional work. Thus, Johnston's obligation to return and do the additional work could not have been discharged by Fowler–McKee's refusal to pay the bill.

■ Nor was Johnston's obligation to do the additional work discharged by Fowler–McKee's failure to pay only $15,000 towards the $19,505 bill submitted on May 28. Johnston's bookkeeper conceded that the bill was calculated at a rate of $1.25 per cubic yard, which was 10¢ above the rate specified in the parties' agreement. N.T. at 184, 7/12/77. There is no question that the $1.25 figure was in error and should not have been introduced into the case. The lower court had previously sustained Fowler–McKee's preliminary objection to paragraph 14 of Johnston's complaint,[5] which

5. Johnston argues that Fowler–McKee should not have been permitted to raise the overpayment defense on preliminary objection because it did not raise it at the time the bill was submitted. Williston on Contracts, § 742 states:

[T]here is frequently a promissory estoppel precluding the assertion of other defenses after refusal [to perform properly] has been made for a specific reason, and the fact that litigation has been begun may have a bearing on the existence of an estoppel.

alleged that during the course of the work Fowler–McKee had agreed to an oral modification of the agreement raising the rate from $1.15 to $1.25 per cubic yard of excess material. Had the May 28 bill been properly calculated, Fowler–McKee's $15,000 payment would have been sufficient; in fact, it would have been an overpayment of $1,143.60.

We must therefore reverse the lower court's order denying Fowler–McKee's counterclaim for damages incurred because it had to hire other truckers to do the additional work that Johnston refused to do, and remand for further findings regarding the amount of those damages.

–3–

■ Fowler–McKee's third argument is that the lower court erred in denying its counterclaim for damages incurred because it had to clean up the streets around the project. The lower court denied the counterclaim on the ground that Fowler–McKee had not met its "burden of proving that Johnston was solely responsible for the dirt or the extent to which the dirt came from Johnston's trucks," and because the dirt may have resulted from Fowler–McKee's overloading of the trucks.

Neither of these reasons is persuasive. In *Pugh v. Holmes*, 486 Pa. 272, 297, 405 A.2d 897, 910 (1979), the Court stated: "It is well established that mere uncertainty as to the amount of damages will not bar recovery where it is clear that damages were the certain result of the defendant's conduct." Here, Fowler–McKee showed persuasively

In *Haney v. Hatfield*, 241 Pa. 413, 88 A. 680 (1913), the defendant–seller refused to convey the property for one reason at settlement, and then tried to justify his refusal for other reasons at trial. The Court found that he was estopped from asserting the other reasons at trial because by failing to assert them at settlement, he did not give the plaintiff an opportunity to properly perform. Here, however, Fowler–McKee's failure to claim that it had been overcharged by the May 28 bill until the litigation began did not result in any detrimental reliance on the part of Johnston. Johnston's brief claims that Johnston sold its trucks in response to Fowler–McKee's failure to pay the full May 28 bill; in fact, Johnston testified that he sold his trucks because he thought the job would be over on May 21. N.T. at 30, 7/12/77.

that the dirt on the streets was from trucks or truck tires. Dale McKee testified:

Q: Now, this mud that we are talking about, would this fall off from the trucks or from the truck tires?

A: No——the truck tires, yes, when they was coming up out of the cut and while running around down in the cut area itself. If it snowed or it was a little freezing and thawing, then it would work up between the tires and stick in the treads of the tires and when it hit the good street, Bouquet Street, it would run out on the road. N.T. at 270, 7/12/77.

Moreover, Johnston himself testified that when he started the job, only his company and Fowler–McKee were present on the site. N.T. at 12, 7/12/77. Later there were Graziano workers on the site. N.T. at 270, 7/12/77, but they were not operating trucks that could do the damage complained of by Fowler–McKee. Finally, whether the dirt on the streets resulted from Fowler–McKee overloading the trucks or Johnston's hauling practices is immaterial, for in either case the agreement between the parties required Johnston to clean up the streets. The relevant paragraph of the agreement provided:

Hauler shall be responsible for ensuring that mud, dirt or other such materials are not deposited in or about the public roadways leading from the excavation site to the disposal site. Hauler acknowledges that the project site is located within the city limits of Pittsburgh and that it has familiarized itself with all of the ordinances and regulations of such City, and any Borough or Township through which the trucks will travel to the disposal site, concerning the hauling of excavated materials and the precautions which must be taken to avoid depositing excess materials upon the public streets of said City, Borough or Township.

Accordingly, since the record makes clear that Johnston did not fulfill this contractual duty, N.T. at 66, 7/12/77, Fowler–McKee is entitled to some damages and on remand the lower court should make further findings regarding the amount of those damages.

Reversed and remanded for further findings consistent with this opinion. After such findings have been made, either party may file exceptions, and if the exceptions are denied, take another appeal.