454 A.2d 581

**COMMONWEALTH of Pennsylvania**

v.

**Mark NICHOLSON, Appellant.**

Superior Court of Pennsylvania.

Argued June 24, 1982.

Filed Dec. 23, 1982.

Dennis J. Cogan, Philadelphia, for appellant.

Gaele M. Barthold, Assistant District Attorney, Philadelphia, for Commonwealth, appellee.

Before CERCONE, President Judge, and SPAETH, CAVANAUGH, WIEAND, McEWEN, CIRILLO and MONTEMURO, JJ.

CIRILLO, Judge:

This is an appeal from the judgments of sentence, dated February 27, 1979, of the Court of Common Pleas of Philadelphia County.

On February 2, 1978, three men armed with guns entered the B & D Variety Store at 51st and Brown Streets in Philadelphia and robbed eight persons of money, watches, wallets and other personal possessions. The appellant, Mark Nicholson, was arrested on May 19, 1978 in connection with this incident. Each of the victims testified at the trial and all were able to identify the appellant, either subsequent to the incident or at trial, as one of the robbers. Their testimony established that the store was well-lighted, that they had an excellent opportunity to observe the unmasked faces of the intruders, and that the robbery lasted more than thirty minutes. Additionally, the victims testified that they had seen the appellant in the neighborhood on previous occasions.

The appellant denied culpability and alleged that the victims conspired to falsely identify him as one of the perpetrators. He sought to support this hypothesis by establishing that none of the victims immediately identified him, either my name or by nickname, to the first police officers on the scene, although he was known by some of the victims. Furthermore, the appellant introduced evidence that he and one of the victims, Jasper Golatt, had belonged to rival gangs earlier and therefore, he contended, Golatt was responsible for the alleged fabrication.

The appellant was convicted by a jury of eight counts of robbery. He subsequently filed post-trial motions for a new trial and in arrest of judgment, which were denied. Following a presentence investigation and a neuropsychiatric examination, the Honorable Curtis C. Carson, Jr. sentenced the appellant to concurrent terms of imprisonment of not less than five years nor more than ten years. The appellant's appeal from these judgments of sentence was argued before a panel of this Court, and was reargued before the Court en banc.[1] We affirm the judgments of sentence of the lower court.

The appellant's first contention on appeal is that certain remarks of the trial judge, made in the presence of the jury, were prejudicial and require the granting of a new trial.[2]

The appellant sought to ascertain whether police, when first arriving on the scene, had asked the victims if they knew who committed the robbery. During the cross-examination of Harry Singleton, one of the robbery victims, the following occurred:

1. This case is before the Court en banc pursuant to a Commonwealth Petition for Reargument, granted on May 25, 1982.

2. Canon 3 of the Code of Judicial Conduct states that a judge should perform the duties of his office impartially and diligently. Among his adjudicative responsibilities, Canon 3 provides:

    A judge should be patient, dignified, and courteous to litigants, jurors, witnesses, lawyers, and others with whom he deals in his official capacity, and should require similar conduct of lawyers, and of his staff, court officials, and others subject to his direction and control.

    Effective: January 1, 1974.

Q. And when the police came in the store, there was no discussion with the police with you about what had happened and who the people were; is that right?

A. Right.

Q. In fact there was no discussion between the police and the other people, other than you—

THE COURT: How can he testify to that?

DEFENSE COUNSEL: If he was there, your Honor.

THE COURT: Well, that doesn't make any difference. He doesn't know what the police asked the other people and I wish you would correct the cross examination to bring out the facts. He doesn't know what the police said to somebody else not in his presence.

DEFENSE COUNSEL: Could we have a sidebar conference?

THE COURT: No.

DEFENSE COUNSEL: I have an objection to make.

THE COURT: Make your objection.

DEFENSE COUNSEL: That wasn't his testimony, my objection is that he was there—

THE COURT: He cannot testify—how does that man know what the police said to other people? According to his testimony, there were nine other people involved in this, the victims of this holdup. Now, how can he tell what the police asked other people?

DEFENSE COUNSEL: My objection respectfully is, your Honor, that that is the proper response to give if he doesn't know what was said, then he says 'I don't know what was said.'

THE COURT: Are you taking into consideration the intelligence of this young man who is on the stand? He's not a lawyer like you. He doesn't know the well-termed phrases. It takes no great shakes to confuse this man and take advantage of his inarticulation *[sic]*.

DEFENSE COUNSEL: I'm not doing that, your Honor.

THE COURT: You are.

DEFENSE COUNSEL: Most respectfully, I object, your Honor, and I feel that I would like to make some argument out of hearing of the jury. I want to protect my client's interest—

THE COURT: I know what your objection is. I want you to proceed with your questioning.

DEFENSE COUNSEL: I have a motion as well.

THE COURT: That's denied, too.

Cross-examination of the witness then immediately continued:

Q. Mr. Singleton, was there any conversation between the police and any of the other people in your presence?

A. No, not that I know of.

The appellant concedes that the intervention by the trial judge did not harm his cross-examination. Rather, he argues that the judge's remarks castigated his counsel, bolstered the credibility of witness Harry Singleton, portrayed his counsel as a "trickster", and may have influenced the attempted impeachment of other Commonwealth witnesses.

"It is a maxim of our jurisprudence that a trial judge occupies an exalted and dignified position and that absolute impartiality in the conduct of the trial is expected of him." *Commonwealth v. England,* 474 Pa. 1, 16, 375 A.2d 1292, 1299 (1977); *See also, Commonwealth v. Nesbitt,* 276 Pa. Super. 1, 419 A.2d 64 (1980). However, as this Court has articulated:

Every unwise or irrelevant remark made in the course of a trial by a judge, a witness, or counsel does not compel the granting of a new trial. A new trial is required when the remark is prejudicial, that is, when it is of such a nature or substance or delivered in such a manner that it may reasonably be said to have deprived the defendant of a fair and impartial trial.

*Commonwealth v. Axe,* 285 Pa.Super. 289, 294, 427 A.2d 227, 230 (1981); *Commonwealth v. Wright,* 279 Pa.Super. 608, 421 A.2d 365, 368 (1980); *Commonwealth v. Phillips,* 183 Pa.Super. 377, 382, 132 A.2d 733, 736 (1957). This

standard has also been adopted by the Pennsylvania Supreme Court in the case of *Commonwealth v. Goosby,* 450 Pa. 609, 611, 301 A.2d 673, 674 (1973).

In *Commonwealth v. Davis,* 497 Pa. 335, 440 A.2d 1185 (1981), the subsequent dialogue transpired:

BY THE COURT:

Q. What was he talking to you about?

A. He wasn't talking about too much. Just about my case, that is all. About my case, like when I get on the stand for me to tell what I know about the case. What happened to me. That's what I'm doing.

Q. That's what your [sic] doing now?

A. Yes.

Q. Did he tell you to say anything that you are not saying now?

A. No.

Q. Did he tell you to say anything that was not part of your case?

MR. SAGEL: Judge, may I interrupt and—

THE COURT: Never interrupt the court. Sit down.

MR. SAGEL: I respectfully—

THE COURT: Sit down.

MR. SAGEL: I respectfully object, Sir.

THE COURT: I said to you to sit down.

MR. SAGEL: I must object—

THE COURT: Sheriff, take him into custody. We'll stand in recess, members of the jury.

The Supreme Court held that the impact of this incident was prejudicial to the appellant and, therefore, a new trial was awarded. In his majority opinion, Mr. Justice Nix observed:

It was a situation likely to leave an indelible impression upon the viewers. The severity of the court's responses would suggest to the uninitiated that counsel's conduct represented a grave departure from the conduct expected of one in his position. There was a reasonable probability the incident may have distracted the jury from an objec-

tive appraisal of those legitimate issues presented on the question of guilt or innocence.

Discord between the trial court and defense counsel is also likely to affect the client's cause. The client's position may be deemed less worthy in the eyes of the jury, by their translating the court's displeasure as an indication of the lack of substance in the client's cause. The fact that counsel is perceived by the jury as having engaged in some serious misbehavior may suggest to the jury that he was forced to resort to such behavior because of the hopelessness of his client's case. The lack of respect for counsel, which may well have been engendered, would necessarily diminish his effectiveness as a persuasive advocate of his client's positions.

497 Pa. at 341–342, 440 A.2d at 1188.

Likewise, in *Commonwealth v. Horvath*, 446 Pa. 11, 285 A.2d 185 (1971), the Supreme Court held that the defendant was deprived of a fair and impartial trial where the trial judge engaged in extended, critical and unnecessary discussion with defense counsel in the presence of the jury.[3] In

---

**3.** The comments which the Supreme Court found to be prejudicial, made at the beginning of the trial are as follows:

The Court:

Before we proceed, members of the jury, I want you to know that, as far as this Judge is concerned, I have waited for a case since 3:00 o'clock yesterday afternoon. At noon yesterday, I advised the Court Administrator that the case I was then trying would be completed by 3:00 o'clock, and for some reason or another—and I finished the case promptly at 3:00 o'clock. She was notified that I was prepared to go ahead and try another case. I got no further case yesterday, and I have been sitting in Chambers all morning until now, ten minutes to 3:00. It was only stirring up things just a few minutes ago that we finally get this jury.

I want you to know that we have a Court Administrator; that Court Administrator has a secretary. The District Attorney has five assistants. He has Mr. Cashdollar as Chief County Detective, a former Federal Bureau Investigation man, an experienced man, and for some reason or another I can't find the answer; I have tried to find it. I don't have the power to enforce it. Why these things go on term after term, I don't know, and I want you to know it, and I want you to know it is not this Judge's fault. If I could do something about it, I would. I am the president Judge of the Orphans' Court. I only assist in Quarter Sessions Court. I can't appreciate this waste of time.

granting a new trial, the majority stated (per Justice O'Brien):

When a judge subjects counsel for one of the litigants to undeserved oral criticism, the delicate balance upon

Now, I see, in going over the list, Mr. Hudacsek, who represents these two young men, has any number of other cases on the list. I don't know whether they have all been disposed of or not or what the situation is.

I also note that his appearance was entered in this case on the 17th of September, which is contrary to our rules. You are supposed to have your appearance entered the date the Grand Jury returns a True Bill, or even before that, but there is a man by the name of Dickenstein as being the attorney. Why he isn't here, why they have taken all day up to now to select this jury, somebody will have to give me the answer.

Now, since the issue is joined,—

Mr. Hudacsek:

May I say something?

The Court:

Yes.

Mr. Hudacsek:

So that it does not unduly prejudice my clients, I had entered my appearance in this case the day I met them, the day they were forwarded to me by Sammy David Dickenstein of Allegheny County. Contrary to the rules or otherwise, that is when I met them, and that is when they first consulted me.

The Court:

Why was the jury not selected this morning? Can you answer that?

Mr. Hudacsek:

Yes. I had another matter being disposed by the Court. That was taken care of this morning.

The Court:

How long did it take?

Mr. Hudacsek:

Twenty minutes.

The Court:

What did you do the rest of the morning.

Mr. Hudacsek:

I waited. This afternoon I was before Judge Scalera. I was there on another matter.

The Court:

How long did it take?

Mr. Hudacsek:

About twenty minutes.

The Court:

Those are the answers you get, members of the jury.

Mr. Hudacsek:

I have been here seven consecutive days.

The Court:

You may swear the jury.

which the creation of such an atmosphere depends may be affected. The jury is bound to remember the incident and the danger is too great that the part represented by the lawyer thus criticized may be prejudiced.

446 Pa. at 18, 285 A.2d at 188.

However, in the case of *Commonwealth v. Rolison*, 473 Pa. 261, 374 A.2d 509 (1977), the grant of a new trial was denied by the Supreme Court despite the following remarks of the trial judge:

THE COURT: I know your name is Joe McGraw; but I really don't. I surmise it. You have always been known to me by that name; but I really don't know that is your name if you want to be strict about it. And we went through this thing a day ago of trying to take a word that in the ordinary use of the English language the ordinary person uses one meaning, and then you try to twist it around to a specific, narrow meaning, and try to make somebody untruthful in doing it; and this is not kosher. I blew my stack that day, and I will be doing it if you persist in this technique.

MR. McGRAW: Your Honor, the only thing, time is very, very loose—

THE COURT: I know what the man says, how he arrives; and then repeating, and repeating does not change the situation one iota.

MR. McGRAW: Thank you, Your Honor.

THE COURT: Now, let us try the case; and instead of trying to play games with semantics—

The Supreme Court, in *Rolison*, held that the statements made by the trial judge did not deprive the appellant of a fair and impartial trial. Rather, the judge was merely reproving counsel in that instance, a proper procedure as expressed by the Superior Court in *Commonwealth v. Frank*, 263 Pa.Super. 452, 398 A.2d 663 (1979).[4]

4. In *Commonwealth v. Frank,* supra, Judge Spaeth, speaking on behalf of an en banc panel of the Superior Court, stated:

A trial judge is not required to remain mute when counsel speaks of irrelevant and prejudicial matters.... Counsel may properly be

■ In the present matter, we find that nothing which happened in the jury's presence undermined counsel's believability, impugned the appellant's case or witnesses, evidenced bias on the part of the court, or suggested that counsel could not continue as an effective spokesman for his client. At most, the trial judge in the instant matter suggested that the phrasing of one question, by counsel for the appellant, was confusing and might mislead the witness, in part because of the witness' poor language skills. Judge Carson certainly acted within his authority since the scope and manner of cross-examination are within the sound discretion of the trial judge. *Commonwealth v. Sisco,* 484 Pa. 85, 398 A.2d 955 (1979); *Catina v. Maree,* 272 Pa.Super. 247, 415 A.2d 413 (1979).

Additionally, we note that on several occasions, cautionary instructions had been given in this case to insure that any statements made by the trial judge would not prejudice the parties. *See: Commonwealth v. Ferguson,* 289 Pa.Super. 163, 432 A.2d 1103 (1981); *Commonwealth v. Marvel,* 271 Pa.Super. 11, 411 A.2d 1254 (1979).[5] In particular, on the day following this incident, Judge Carson advised the jurors:

At the time I give you instructions, I'm going to again remind you that you are to determine this case soley [sic] from the testimony. I don't want you to consider the rulings of the court, the actions of the court, the actions of counsel, any other displays. I don't want you to decide this case on emotion or that you feel sorry for someone. I want you to focus soley [sic] on the facts and the evidence that you will have with you at the time.

admonished on such occasions as long as the trial judge does not display partiality or prejudice by his conduct, manner of speech, or choice of language. [Citation omitted.]
263 Pa.Super. at 473, 398 A.2d at 674.

5. The jury is presumed to follow instructions given by the court. *Parker v. Randolph,* 442 U.S. 62, 75 n. 7, 99 S.Ct. 2132, 2140 n. 7, 60 L.Ed.2d 713 (1979); *Commonwealth v. Brown,* 444 Pa. 318, 282 A.2d 364 (1971).

The trial judge also gave the following instruction during his charge to the jury:

... And I feel good about this system because I try to treat everyone fairly, I try to treat people and the people that appear before me in much the same fashion that I wanted to be treated for the 25 years that I was a trial lawyer. Sometimes I'm impatient with counsel. But, members of the jury, all of this is human. That's why I'm saying to you, from what you have seen or heard me do or say in this courtroom, don't take that, please, don't take that as an indication that I have a conviction one way or the other; because you will never know because I will never comment to you. And I want this to be your own independent judgment.

Having carefully reviewed the challenged remarks in the context of the trial and in light of the cautionary instructions,[6] we are satisfied that these comments, which were directed only to counsel and not to his client, did not reach the level where it could reasonably be concluded that the appellant was deprived of a fair and impartial trial. *See: Commonwealth v. Humphreys*, 267 Pa.Super. 318, 406 A.2d 1060 (1979). Accordingly, we reject this initial contention of the appellant.

The appellant next contends that the testimony of victim Milton Taylor and Officer Robert Prendergast created an inference of prior criminal activity by the appellant, thus warranting a new trial. On cross-examination, Commonwealth witness Milton Taylor testified as follows:

DEFENSE COUNSEL:

Q. You say that you also remember the face. I want to make sure you understand the testimony. You didn't say anything on direct examination about that, but is it your testimony that my client was there inside the store.

A. Yes.

---

**6.** Adequate cautionary instructions may minimize the impact of an error so as to render it harmless. *E.g., Commonwealth v. Story*, 476 Pa. 391, 383 A.2d 155 (1978); *Commonwealth v. Davenport*, 462 Pa. 543, 342 A.2d 67 (1975).

382

Q. And you're making an identification based on what you saw, is that right?

A. Yes.

Q. And before the robbery itself on February 2nd, 1978, you knew his name was Bucky, is that right?

A. Yes.

Q. And did you tell the detectives down at the Detective Division that you knew his name was Bucky? Did you tell them that?

A. No, they showed us some slides.

The appellant argues that a prior criminal record was suggested when the witness testified that "[police] showed us some slides." It has been well stated by Pennsylvania appellate courts that:

> The suggestion that any reference to a defendant's photograph is so prejudicial that an inflexible rule of reversal must apply is explicitly rejected. We hold that after the reference to a photograph the controlling question is whether or not a juror could reasonably infer from the facts presented that the accused had engaged in prior criminal activity. A mere passing reference to photographs from which a reasonable inference of prior criminal activity cannot properly be drawn does not invalidate the proceedings since there has been no prejudice as a result of the reference....

*Commonwealth v. Allen*, 448 Pa. 177, 181, 292 A.2d 373, 375 (1972); *Commonwealth v. Krasner*, 285 Pa.Super. 389, 409, 427 A.2d 1169, 1179 (1981).

■ The witness never testified that he identified the appellant from the slides mentioned, or for that matter, from any photographic array.[7] Under the circumstances, we find it unlikely that the jury could infer from the

7. Prior to the trial, the lower court granted the appellant's Motion to Suppress the out-of-court identifications since the slide projections, viewed in the police station, were conducted in the presence of all of the participants and identifications were made openly in each other's presence.

witness' passing "slide" reference that the appellant had engaged in prior criminal conduct.

■ Likewise, the testimony of Officer Prendergast, that the appellant, Jerry Nicholson, also used his brother's name, Mark Nicholson, did not raise an implication of past criminal involvement. The appellant was arraigned under the name of Mark Nicholson, yet one of the witnesses identified the appellant, at trial, as Jerry Nicholson. This reference by the officer merely helped to resolve the jury's confusion over whether the appellant was in fact Jerry or Mark Nicholson.[8] *See: Commonwealth v. Miller*, 268 Pa. Super. 123, 407 A.2d 860 (1979).

■ We also find that Officer Prendergast's testimony that he knew the appellant as "Bucky" and the co-defendant as "Tick" prior to the date of arrest, did not imply that the appellant had a past criminal record. The officer never explained how he had become familiar with the appellant's nickname, nor did he describe the nature of their relationship. There is no basis from which to conclude that the jury would speculate, based merely on the officer's knowledge of the appellant's nickname, that Officer Prendergast had known the appellant due to past criminal activity, especially since the officer had been assigned to this neighborhood for a long period of time. *See: Commonwealth v. Starks*, 484 Pa. 399, 399 A.2d 353 (1979). Moreover, several of the victims had testified that the appellant was known in the locale as "Bucky". The testimony of the officer that he, too, knew the appellant as "Bucky" was, therefore, probative of the appellant's identity as one of the robbers and did not suggest that the appellant had a previous criminal record. *Commonwealth v. Oglesby*, 274 Pa.Super. 586, 418 A.2d 561 (1980).

8. Testimony by the police officer that the appellant answered to both the names "Jerry" and "Mark" were merely cumulative of other evidence which established the appellant's name and identity and, therefore, any error was harmless. *See: Commonwealth v. Rodgers*, 472 Pa. 435, 372 A.2d 771 (1977).

■ The appellant further contends that the comments by the assistant district attorney during his closing argument, concerning the appellant's gang affiliation, constituted prosecutorial misconduct. During closing arguments, the prosecutor must limit his or her statements to the facts in evidence and legitimate inferences from those facts. *Commonwealth v. Anderson*, 490 Pa. 225, 415 A.2d 887 (1980); *Commonwealth v. Williams*, 295 Pa.Super. 369, 441 A.2d 1277 (1982); *Commonwealth v. Leymeister*, 285 Pa.Super. 539, 428 A.2d 176 (1981). "Comments by the district attorney do not constitute reversible error unless the unavoidable effect of such comments would be to prejudice the jury, forming in their minds fixed bias and hostility toward the defendant so that they could not weigh the evidence objectively and render a true verdict." *Commonwealth v. McNeal*, 456 Pa. 394, 400, 319 A.2d 669, 673 (1974); *Commonwealth v. Boone*, 287 Pa.Super. 1, 6, 428 A.2d 1382, 1389 (1981). Furthermore, allegedly prejudicial remarks must be read in the context of the case as a whole. *Commonwealth v. Raffensberger*, 291 Pa.Super. 193, 435 A.2d 864 (1981).

This Court has recognized that "... it is very difficult and often impossible, to assess the atmosphere of a trial simply by reading a printed record." *Commonwealth v. Coleman*, 235 Pa.Super. 379, 386, 341 A.2d 528, 532 (1975). Under the attendant circumstances, this dilemna is particularly pointed. After the defense attorney concluded his unrecorded summation, he then requested, outside of the Court's hearing, that the prosecutor's closing argument be recorded by the court stenographer. Counsel thus created a situation where an appellate court, reviewing the assistant district attorney's summation, would be unable to determine from the record whether that argument fairly responded to comments made by defense counsel during his closing address.

■ Throughout the trial, the defense sought to focus the jury's attention on the witnesses' failure to identify the

appellant from the outset of their contact with the police. In the Opinion of the Court below, Judge Carson stated:

> In closing summation to the jury, the defense attorney referred to the defendant's gang activity in support of his argument that one of the eleven witnesses of the Commonwealth allegedly belonged to a rival gang and hence supplied the motivation for false accusation. He further argued to the jury that this witness orchestrated the identification of the other Commonwealth's witnesses concluding that this was why his client was identified by all persons, who based their identifications on "having seen defendant in the neighborhood."

(Trial Ct. Slip Op. at 13).

The prosecutor suggested in his closing that the witnesses were perhaps reluctant to immediately identify the appellant to police because of his known gang affiliation. Unquestionably, this reference was reasonable in view of the evidence on record concerning the appellant's past gang affiliation, as well as the closing argument of defense counsel as recalled by the trial judge. We find that the assistant district attorney's remarks did not prejudice the appellant and, therefore, did not constitute prosecutorial misconduct.[9]

Finally, the appellant contends that reversible error was committed when a detective was permitted to testify that Preston Satterfield, a victim who did not identify the appel-

---

**9.** The defense attorney did not raise an immediate challenge to the prosecutor's summation, thereby allowing the court to instantly rule and to correct any error. Instead, counsel waited until the following morning to make his objections. It has been held that "[A]n absence of any objection to the remarks at the time of their utterance weigh heavily in the determination that they are not actually prejudicial." *U.S. v. Lawson,* 337 F.2d 800, 807 n. 4 (3rd Cir.1964), *cert. denied* 380 U.S. 919, 85 S.Ct. 913, 13 L.Ed.2d 804 (1965). *See also: Commonwealth v. Brooks,* 454 Pa. 75, 78, 309 A.2d 732, 733 (1973). In the present case, this unexplained delay by defense counsel in objecting to the comments of the assistant district attorney aids us in determining that the appellant was not prejudiced by those comments.

lant at trial, had provided police with the appellant's nickname shortly after the robbery occurred.[10]

The Commonwealth presented a compelling case in which six victims identified the appellant as one of the three males who robbed them at gunpoint. Mr. Satterfield was not asked to make an in-court identification of the appellant, presumably because of the suppression of his out-of-court identification. In the case of *Commonwealth v. Norris*, 498 Pa. 308, 446 A.2d 246 (1982), the Pennsylvania Supreme Court (per Mr. Justice Hutchinson) stated:

> Under the test adopted by this court in *Commonwealth v. Story* (citations omitted), evidence improperly admitted can be treated as harmless on any one of three grounds, namely, that the evidence of guilt, without regard to the tainted evidence, is so overwhelming that conviction would have followed beyond a reasonable doubt without regard to it, *that the tainted evidence was merely cumulative of other proper persuasive evidence on the issue for which it is offered,* or that it was so slight or tangential in its effect that its influence on the jury can be determined to have been de minimis. (emphasis added).

498 Pa. at 317, 446 A.2d at 250.

In the case at bar, the detective's testimony corroborated six pieces of similar and already admitted evidence. Since the challenged testimony was merely cumulative of this other properly admitted and persuasive evidence, we find that the admission of the detective's hearsay state-

**10.** The appellant's averment of error by the lower court stems from the admission into evidence of the following testimony:

Q. (ASSISTANT DISTRICT ATTORNEY) Let's move on to Mr. Satterfield.
A. (DETECTIVE) Preston Satterfield?
Q. Yes, sir. Did you receive any names or nicknames from Mr. Satterfield?
(DEFENSE COUNSEL) Objection.
A. Yes, sir.
Q. What if any names or nicknames did you receive?
A. He gave me the nickname of Bucky and he gave me the name of Tyrone.

ment, although error, was harmless error. *See: Commonwealth v. Norris,* supra; *Commonwealth v. Story,* supra.

Accordingly, we affirm the judgments of the sentence of the court below.

SPAETH, J., files a dissenting opinion, in which CERCONE, President Judge, concurs in the result.

SPAETH, Judge, dissenting:

The judgment of sentence should be reversed and the case remanded for a new trial.

The majority says that "[it] find[s] that nothing which happened in the jury's presence undermined counsel's believability, impugned the appellant's case or witnesses, evidence bias on the part of the court, or suggested that counsel could not continue as an effective spokesman for his client." At 586. But what we find depends upon what we see. And what we see depends upon how we approach the problem at hand. Our findings, in other words, are controlled by our standards, and our standards, in turn, are disclosed by our findings. When we listen to music, and announce that we find it beautiful, we disclose our standard of beauty. When an appellate court reads a record, and announces that it finds that the trial was fair, it discloses its standard of fairness. I admit to feelings close to heartbreak at the majority's disclosure today of this court's standard of fairness.

1

The reason the majority has gone so wrong is that it has forgotten the fundamental principle of appellate decision: an appellate court mustn't even start to read a record until it determines the appropriate standard of review. What makes this principle fundamental is that the result of the case will depend upon the standard of review chosen; if the appellate court chooses the wrong standard, it will almost certainly come to the wrong result.

This is readily seen by reference to the civil side. For example: In an equity case, we must regard the chancel-

lor's findings, when affirmed by the court en banc, as equivalent to a jury's verdict. *Eddystone Fire Co. No. 1 v. Continental Insurance Companies*, 284 Pa.Super. 260, 425 A.2d 803 (1981); *Johnston Truck Rental Co., Inc. v. Fowler-McKee Co.*, 281 Pa.Super. 271, 422 A.2d 164 (1980). In a default judgment case, we must decide whether, when all the circumstances have been weighed one against the other, it appears that the lower court abused its discretion. *Provident Credit Corp. v. Young*, 300 Pa.Super. 117, 446 A.2d 257 (1982) (collecting cases); *Funds for Business Growth, Inc. v. Woodland Marble & Tile Co.*, 443 Pa. 281, 278 A.2d 922 (1971); *James v. Reese*, 250 Pa.Super. 1, 378 A.2d 422 (1977). In a child custody case, we must make an independent judgment of what is in the child's best interests. *Commonwealth ex rel. Oxenreider v. Oxenreider*, 290 Pa. Super. 63, 434 A.2d 130 (1981); *Commonwealth ex rel. Berman v. Berman*, 289 Pa.Super. 91, 432 A.2d 1066 (1981) (quoting *Commonwealth ex. rel. Pierce v. Pierce*, 493 Pa. 292, 296, 426 A.2d 555, 557 (1981)). And so on. If in any of these cases we choose the wrong standard of review—if we feel too free in an equity case, or too restricted in a child custody case—our decision will also almost certainly be wrong.

The same holds true on the criminal side. There, roughly speaking, there are three standards of review, which may be distinguished from each other according to the attitude that the appellate court will take toward the defendant, as it applies one standard or another.

By the first standard, the court will, so to speak, ignore the defendant. For even though it is plain from the record that the defendant is guilty, the standard may require the court to discharge him. Two such cases commonly occur. The defendant may have been caught with contraband in his possession, and yet, if the police have gotten the contraband as the result of an unlawful arrest or search of the defendant, the court must suppress the contraband, knowing that the result of its order will be the defendant's eventual discharge. *Mapp v. Ohio*, 367 U.S. 643, 81 S.Ct. 1684, 6

L.Ed.2d 1081 (1961); *Commonwealth v. Diggs*, 260 Pa.Super. 349, 394 A.2d 586 (1978). Or the defendant may have been convicted, on overwhelming evidence, and yet, if his trial was not held within the period specified by Pa.R. Crim.P. 1100, the court must order him discharged. *Commonwealth v. Ehredt*, 485 Pa. 191, 401 A.2d 358 (1979); *Commonwealth v. Antonuccio*, 257 Pa.Super. 535, 390 A.2d 1366 (1978).

By the second standard, the court will be, if not unreceptive to, at least skeptical of, the defendant's arguments. Again, two such cases commonly occur. If the defendant argues that he was unlawfully arrested, the court will only ask whether a reasonable police officer could have believed that the defendant was engaged in criminal activity. *Commonwealth v. Bartlett*, 486 Pa. 396, 406 A.2d 340 (1979); *Commonwealth v. Stokes*, 480 Pa. 38, 389 A.2d 74 (1978). It may well be, and the court will concede, that the officer might have been mistaken, and that in fact the defendant is innocent. But that possibility won't matter to the court's decision on the legality of the arrest. Or the defendant may argue that the evidence was insufficient to support his conviction. In fact, most of the evidence may appear to the court, as it examines the record, to favor the defendant. Nevertheless, the court will discount, even ignore, that evidence, instead examining the record in the light most favorable to the Commonwealth. *Commonwealth v. Boone*, 467 Pa. 168, 354 A.2d 898 (1975); *Commonwealth v. Chapman*, 255 Pa.Super. 265, 386 A.2d 994 (1978). Although the majority does not acknowledge the fact, this is its approach to the record here: whatever doubts are suggested as to whether the trial was fair are dispelled in favor of the Commonwealth.

By the third standard, the court assumes that the defendant is innocent, and examines the record from that perspective. A noble statement of this standard may be found in *People v. Zackowitz*, 254 N.Y. 192, 172 N.E. 466 (1939) (CARDOZO, CH.J.) There the issue was the admissibility of evidence of prior crime. The court reversed and ordered

a new trial, holding that admission of the evidence was contrary to the general rule that character is never an issue in a criminal prosecution unless the defendant chooses to make it an issue. Explaining this rule, the court said: "In a very real sense a defendant starts his life afresh when he stands before a jury, a prisoner at the bar." *Id.* at 197, 172 N.E. at 468.

It is this third standard that we should apply here. When appellant stood before the jury below, he was an innocent man. He was starting his life afresh. Accordingly, when we examine the record of what ensued, we should ask whether, as an innocent man, he received a fair trial.

This does not mean that we should ask whether the trial was without any error. The right to a fair trial is not, it has been properly said, the right to a perfect trial. *Commonwealth v. McQuaid*, 273 Pa.Super. 600, 417 A.2d 1210 (1980); *Commonwealth v. Grimm*, 249 Pa.Super. 441, 378 A.2d 377 (1977). In almost every trial, error will occur, and it would be intolerable to require that a trial be repeated, and re-repeated, until no error occurred. Accordingly, the question is not whether there was error, but whether the error was so serious as to deprive the defendant of his right to a fair trial. *See, e.g., Commonwealth v. Snopek*, 200 Pa.Super. 455, 190 A.2d 161, *cert. denied*, 375 U.S. 933, 84 S.Ct. 338, 11 L.Ed.2d 265 (1963); *Commonwealth v. Harris*, 195 Pa.Super. 606, 171 A.2d 850 (1961).

The best, indeed, I think the only, way to answer this question is to assume that *we* were the ones on trial. Suppose that *we*, who *know* we are innocent, had been convicted. Would we say something like this? "The jury has wrongly found me guilty. And the judge made mistakes in conducting the trial. Still, the evidence against me was strong, the judge's mistakes were not serious, and I can see why the jury found me guilty. Although I am bitterly disappointed, as a reasonable person I admit that I got a fair trial." Only by such a standard can we ensure that "the presumption of innocence" *is* a presumption; that it is not an empty phrase but a source of protection; and

that when he stands before a jury, a defendant really does start his life afresh.

2

If one examines the record by the proper standard—from the perspective of an innocent man—one cannot, I submit, escape the conclusion that appellant was denied his right to a fair trial.

*The* prerequisite of a fair trial is that the trial judge conduct the trial with absolute impartiality. The judge must not, by his comments, or demeanor, or in any other way, display any partiality to or prejudice against either party or either attorney. *Commonwealth v. Davis,* 497 Pa. 335, 440 A.2d 1185 (1981); *Commonwealth v. England,* 474 Pa. 1, 15, 375 A.2d 1292, 1299 (1977); *Commonwealth v. Williams,* 468 Pa. 453, 364 A.2d 281 (1976); *Commonwealth v. Goosby,* 450 Pa. 609, 301 A.2d 673 (1973); *Commonwealth v. Stallone,* 281 Pa. 41, 126 A. 56 (1924).

The majority seeks to justify the trial judge's comments as within the scope of his discretion to control the scope and manner of cross-examination. At 381. A trial judge does, of course, have the authority in appropriate circumstances to limit cross-examination. But that authority must be exercised in a manner consistent with the judge's duty to conduct the trial with absolute impartiality. Here, without question, the trial judge did not so exercise his authority. For when the judge said, "It takes no great shakes to confuse this man and take advantage of his inarticulation [*sic*]," he announced to the jury his opinion, not only that appellant's counsel was taking advantage of the witness, but also, that any testimony elicited by counsel in support of appellant's position was not to be credited because it came from a confused, inarticulate witness. Thus the judge made plain to the jury his own belief that appellant was guilty.

Perhaps the jury would have found appellant guilty anyway. It seems likely that they would have. For appellant's defense that the robbery victims had fabricated their identification of him at the prompting of an old gang rival seems

weak, given the unanimous identification testimony by victims who had a good look at the robbers. Nevertheless, it was appellant's only defense, and he was entitled to pursue it. The fact that the victims *did* have such a good look at the robbers cuts both ways. If appellant was so well known, and so plainly seen, by the victims, why did not at least one of them identify him to the police on the scene when the police asked for information about the robbery? It was in any event no part of the trial judge's duty to undermine the defense by showing that he didn't accept it.

In *Commonwealth v. England, supra,* the defendant, who was found guilty of first degree murder, objected to several intemperate remarks by the trial judge. There, after sustaining several objections to defense counsel's use of leading questions, the trial judge said, "We don't need any speeches Mr. Evans ... I have permitted great latitude now. I think we have gone far enough ....;" and after sustaining a Commonwealth objection to a question posed to defendant's father concerning his son's prison experience, "We are trying the events of January 24, 1971, not the entire prison system, Mr. Evans ....;" and following defense counsel's glance at a clock, "That clock won't help you back there, Mr. Evans. It is about 3:12 now." *Id.* 474 Pa. at 15–16 n. 8, 375 A.2d at 1299 n. 8. In concluding that the defendant was not entitled to a new trial, the Supreme Court said:

Here, after a careful review of the record before us, we are satisfied that these isolated comments, which were directed solely to counsel and not his client, did not reach the level where it could be reasonably concluded that appellant was deprived of a fair and impartial trial. Appellant complains of no extended, aggressive or partisan examination of himself, *Commonwealth v. Williams,* 468 Pa. 453, 364 A.2d 281 (1976); *Commonwealth v. McCoy,* 401 Pa. 100, 162 A.2d 636 (1960), no indication of the opinion of the court on the merits of the case, *Commonwealth v. Motley,* 448 Pa. 110, 289 A.2d 724 (1972); no expressions of doubt as to the credibility of a witness,

*Commonwealth v. Butler*, 448 Pa. 128, 291 A.2d 89 (1972); and no independent manifestation of bias in favor of the prosecution, *Commonwealth v. Hales*, 384 Pa. 153, 119 A.2d 520 (1956); *Commonwealth v. Trunk*, 311 Pa. 555, 167 A. 333 (1933). Additionally, the court in its instructions properly charged that the jury was the sole judge of the facts and the arbiter of the truth. Under these circumstances we cannot say that the remarks of the court so tainted the proceeding as to require a reversal of the judgment of sentence. *See Commonwealth v. Myma*, [278 Pa. 505, 123 A.2d 486], *supra*.

*Id.*, 474 Pa. at 17, 375 A.2d at 1300.

Here, in contrast, there *was* "indication of the opinion of the court on the merits," and an "independent manifestation of bias in favor of the prosecution."

This case is very similar to some of the cases cited by the Supreme Court in *Commonwealth v. England, supra*, in particular, *Commonwealth v. Butler*, 448 Pa. 128, 291 A.2d 89 (1972), and *Commonwealth v. Hales*, 384 Pa. 153, 119 A.2d 520 (1951).

In *Butler*, the trial judge was alleged to have made an "extended grimace of surprise" in response to a statement by an alibi witness. The defendant argued that this "conduct of the trial judge deprived him of a fair trial by subtly conveying the Court's own views on th[e] case, particularly on the credibility of the witnesses." *Id.*, 448 Pa. at 133, 291 A.2d at 92. The trial judge responded to this argument by stating, "It is my opinion the Trial Judge has a right, if people are lying, as he believes, to examine him." *Id.*, 448 Pa. at 134, 291 A.2d at 92 (quoting transcript). The Supreme Court, however, emphatically disagreed with this opinion, stating:

Credibility is solely for the jury. Just as a trial judge is not permitted to indicate to the jury his views on the verdict that they should reach in a criminal case, *Commonwealth v. Motley*, 448 Pa. 110, 289 A.2d 724 (1972); *Commonwealth v. Archambault*, 448 [Pa.], 90, 290 A.2d 72 (1972), similarly he is not permitted to indicate to a

jury his views on whether particular witnesses are telling the truth.

*Id.*, 448 Pa. at 134–35, 291 A.2d at 92.

The Supreme Court denied defendant's request for a new trial, but only because the record did not support his allegation of an "extended grimace." It is clear that if the trial judge had in fact grimaced, the Court would have ordered a new trial. *Id.*, 448 Pa. at 136, 291 A.2d at 93.

In *Hales*, the defendant's conviction of first degree murder was overturned and the Court did order a new trial because of the trial judge's remarks. There, defense counsel, on cross-examination of the chief of county detectives, asked about the circumstances of the defendant's confession. The trial judge, after questioning counsel's motives in asking the questions, said, "We are not going to permit that in this court room by innuendo, that these police officers and these county detectives deliberately try to trick any defendant ...." 384 Pa. at 155, 119 A.2d at 524.

The majority suggests that the prejudicial impact of the trial judge's remarks was mitigated by the judge's cautionary instructions, the context of the trial, and the fact that the remarks were addressed to counsel, rather than to appellant. At 586.

First, the judge's cautionary instructions could not, I suggest, begin to dispel the impression already given by the judge that he believed appellant guilty. "[The] trial judge is the person to whom the jurors look for guidance." *Commonwealth v. Stallone, supra,* 281 Pa. at 43, 126 A. at 57. While jurors may understand that it is their responsibility to determine the facts, in exercising that responsibility they will almost certainly be influenced by the opinion of the trial judge, who will be seen by them as someone who has had far more experience than they in trying to determine the truth from the conflicting testimony often elicited at trials.

Second, the context of the trial did not mitigate but instead aggravated the prejudicial impact of the trial judge's remarks. The incident of the inarticulate witness

was not the only time the trial judge disclosed his feelings about the case.

For example: When appellant's counsel, on cross-examination of one of the police officers who had responded to the robbery, attempted to elicit an explanation for the lack of identification by the victims, the following occurred:

Q. My question to you is that: knowing that the robbery had just been committed a short time before that in that area, in the area where the store was, because it was committed at the store, weren't you concerned about whether or not they could identify anyone and find those people while the trial [*sic;* "trail?"] was still fresh and send out flash information?

THE COURT: Are you concerned about what he should have done?

Now, he's just told you [what is] on the [police report sheet] and are you going to go over what he should have been concerned with?

MR. COGAN [defense counsel]: No, because—

THE COURT: You're making argument. What you're trying to extract from this witness is what he did, not what he should have done, or what was better to do.

MR. COGAN: I'm not attacking him for what he did, your Honor.

THE COURT: You shouldn't attack him for anything.

MR. COGAN: That's not the point.

THE COURT: Don't argue what should have been done, we are concerned with getting identification descriptions down. He didn't do it.

THE COURT: Rephrase your question, Mr. Cogan. And listen to the witness, what he did.

N.T. 511–512.

It seems to me most unfortunate that a trial judge should, *sua sponte*, instruct defense counsel that he "shouldn't attack [the prosecution's witness] for anything," for surely, in the jury's eyes, that puts the judge on the prosecution's side.

Another example: During the Commonwealth's cross-examination of appellant, appellant's counsel requested a sidebar. The court denied the request, and the Commonwealth proceeded with its questioning. The following then occurred:

MR. COGAN: Your Honor, most respectfully as an officer of the court, I would ask to see you at sidebar. I assure you it's not dilatory. I have a reason to see you at sidebar.

N.T. 676.

At sidebar appellant objected to "the district attorney sitting there for the last several minutes with a police criminal record in front of him in plain view of the jury." *Id.* Counsel also moved for a mistrial. The trial judge acknowledged that the district attorney had a file in which "it might be possible there is a criminal record," but concluded that it would have been impossible for the jury to have seen it, *id.* at 677, and therefore overruled counsel's objection and denied his motion for mistrial. I don't question the correctness of this ruling. But immediately after the sidebar, the following occurred in open court:

THE COURT: Counsel, I don't want any more dialogue. Did both you gentlemen understand that? I don't permit dialogue at the time court is in session.

MR. BOOKER [counsel for appellant's co-defendant]: Sir?

THE COURT: Did I advise you, Counselor, I don't want dialogue going on while the court is in session unless you ask permission?

MR. BOOKER: No, sir, you didn't ever say that.

THE COURT: I'm sure I did.

MR. BOOKER: You mean between myself and co-counsel?

THE COURT: Yes, indeed.

MR. BOOKER: You never advised us of that sir.

THE COURT: Will you please discontinue it.

MR. BOOKER: I will abide by it, sir.

*Id.* at 678–79.

From this the jury must have gotten the impression that appellant's counsel's entirely proper request for a sidebar had in fact been improper and that during sidebar, appellant's counsel and his co-defendant's counsel had done something that required them to be scolded before the jury.

Other instances might be cited of conduct manifesting irritation with the defense. N.T. 217–19; 263–65; 293–94; 492–93; 701–08; 807. However, I put no particular weight on these instances; they weren't all in the presence of the jury, and in any case, there is no requirement that a trial judge be unfailingly sweet-tempered. In my view, the incident of the inarticulate witness was by itself reversible error. I have only cited other instances in response to the majority's suggestion that the incident of the inarticulate witness was an isolated instance, the prejudicial impact of which was mitigated by the context of the entire trial.

Finally, I fail to see the relevance of the majority's observation that the trial judge's remarks were addressed to counsel, rather than to appellant. The point is that the remarks, with their implications regarding the judge's opinion of appellant's guilt, were made within the hearing of the jury. The prejudicial impact of the remarks was in no way diminished—it may even have been enhanced—by being addressed to counsel, rather than to appellant.

3

I admitted at the beginning of this opinion to feelings close to heartbreak. I suppose that statement seems somewhat overwrought, but I don't think it is.

I have little doubt that appellant is guilty, and I fully expect that after a fair trial he would be convicted again. But appellant's guilt isn't what this case is about. It's about whether we mean what we say, when we say that every defendant is entitled to a fair trial. "Words, words, words!" said Eliza Doolittle. "Don't talk to me of love! Show me!" It's what we *do* that counts, not what we *say*. Every form of art, every intellectual discipline, is weakened

when its fundamental principles are ignored—when we say they are important, but by our actions show they are not.

The judgment of sentence should be reversed and the case remanded for a new trial.

CERCONE, President Judge, concurs in the result.